AS MODIFIED: NOVEMBER 23, 2011
RENDERED: DECEMBER 16, 2010
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2009-SC-000015-DG

**FINAL DATE** 11-23-11 Ewa Grout, D.C.

BLACKSTONE MINING COMPANY                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.          CASE NO. 2007-CA-001610-MR
PIKE CIRCUIT COURT NO. 97-CI-00684

TRAVELERS INSURANCE COMPANY                    APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**REVERSING AND REMANDING**

Blackstone Mining Company, Inc., appeals from an opinion of the Court of Appeals reversing the summary judgment granted to Blackstone by the Pike Circuit Court. Appellee, Travelers Insurance Company, brought suit in the Pike Circuit Court alleging that Blackstone had underpaid premiums under two separate workers' compensation policies issued by Travelers. Blackstone counterclaimed, alleging that it had overpaid the premiums due under the policies and was entitled to a refund.

As further explained below, we conclude that the Court of Appeals incorrectly applied well-established burden of proof principles applicable to summary judgment motions, and that the circuit court had correctly determined that Blackstone Mining was entitled to summary judgment. We accordingly reverse the Court of Appeals, and reinstate the summary judgment

entered in favor of Blackstone and remand for consideration of other remaining issues.

## FACTUAL AND PROCEDURAL BACKGROUND

In the light most favorable to Travelers, the facts are as follows. Blackstone is in the business of providing above-ground supervisory personnel to work at coal mines operated by third-parties. Travelers is an insurance company which, among other things, underwrites workers' compensation insurance policies.

Blackstone purchased two workers' compensation insurance policies from Travelers. The first policy period began on August 29, 1992, and ended on August 28, 1993. The second policy period began on August 29, 1993, and ended on August 28, 1994. At various times during the periods of coverage, twenty-three of Blackstone's employees executed Department of Workers' Claims forms[1] rejecting workers' compensation coverage as permitted under KRS 342.395. In lieu of workers' compensation coverage, Blackstone provided the employees with a policy of disability and life insurance underwritten by Massachusetts Mutual Life Insurance Company (Mass Mutual). Because the Mass Mutual policies were available under a plan designated only for "key employees," each of the relevant twenty-three employees was given a formal

---

[1] Department of Workers Claims Form 4. The form includes the language "I Hereby Notify My Employer . . . that I do not accept, and do not want to work under the provisions of Kentucky Revised Statutes Chapter 342, commonly known as the Workers' Compensation Act of Kentucky."

title as a corporate officer of Blackstone for the sole purpose of qualifying for coverage.

After the conclusion of the second policy period, Travelers audited Blackstone's employment records for the purpose of adjusting its premium on the workers' compensation policies. Based upon its audit, Travelers concluded that fourteen of Blackstone's employees, all of whom had rejected workers' compensation and enrolled in the Mass Mutual program, had been omitted from the Travelers's policies for each of the periods, and, consequently, no premiums had been paid for their coverage. Travelers believed that the decision of those employees to opt out of their workers' compensation policy was not in compliance with KRS Chapter 342, and that during the applicable period, Travelers was liable for workers' compensation benefits payable to those employees had any of them sustained a work-related injury.[2] Travelers therefore argued that it was entitled to collect premiums based on its potential liability to these fourteen employees. By Travelers's calculation, Blackstone owed an additional $474,870.00 in unpaid premiums.

Blackstone refused Travelers's demand for payment of that amount. On May 2, 1997, Travelers filed a complaint in Pike Circuit Court seeking to recover the additional premiums. In its complaint, Travelers acknowledged that each of the fourteen employees had executed a Form 4 rejection notice and

---

[2] No claims for workers compensation benefits were made by any of the employees who had rejected coverage. Nor did any of the employees make a claim for benefits under the Mass Mutual disability policy. There is nothing in the record to suggest that any of the affected employees were injured during the relevant time period.

3

filed it with the Department of Workers' Claims pursuant to KRS 342.395 to reject workers' compensation coverage. Travelers alleged, however, that the rejections were not voluntarily made by the employees as required by KRS 342.395(1), and were therefore invalid. No factual basis for that allegation was stated in the complaint.

In response, Blackstone filed a counter-claim alleging that twenty-three, rather than fourteen, of its employees had filed valid rejection notices and, consequently, it had overpaid workers' compensation premiums on the two policies in the amount of $120,861.00. Blackstone averred that each of the twenty-three employees had voluntarily rejected workers' compensation coverage in favor of the disability insurance policy issued by Mass Mutual.

The case proceeded to discovery during which Blackstone's president, Raymond Strawser, and Blackstone employee Harold Dean Thacker were deposed. Strawser testified that his employees were given an unqualified choice of whether to remain covered under workers' compensation, or whether to enroll in the Mass Mutual policy. Thacker testified that he evaluated the two options, and voluntarily chose Mass Mutual as the better plan. No deposition or other evidence from any of the other twenty-two employees whose rejection of workers' compensation protection was at issue was presented. However, each Form 4 rejection notice signed by one of the twenty-three Blackstone

4

Mining employees was filed in the record, along with the business record of the Department of Workers' Claims verifying its receipt of the rejections forms.[3]

With discovery thereby completed, the parties filed cross-motions for summary judgment. On August 23, 2004, the trial court entered an order granting partial summary judgment in favor of Blackstone. The court concluded that "no genuine issue of material fact exists that 23 of [Blackstone's] employees voluntarily rejected workers' compensation coverage." The court denied summary judgment on the question of damages and scheduled further proceedings to resolve that issue.

In lieu of a trial, it was agreed that each party would submit to the trial court its proposed findings of fact indicating how it believed the court should calculate the alleged overpayment or underpayment of Blackstone's workers' compensation premium. Embedded within this calculation was the additional issue of whether the Mass Mutual policy satisfied Blackstone's duty to provide coverage for pneumoconiosis (black lung) pursuant to the Federal Black Lung Benefits Act, 30 U.S.C. § 901 et seq., and whether Blackstone owed premiums to Travelers for black lung coverage of the twenty-three employees, regardless of whether it owed Travelers for workers' compensation coverage of those employees.

The trial court concluded that the Mass Mutual policy covered black lung in accordance with federal law, and that Blackstone had overpaid Travelers for

---

[3] The Department's record also identified eight Blackstone employees who had *not* filed rejection notices.

5

workers compensation coverage in the sum $120,861.25. Judgment was entered accordingly in Blackstone's favor. For reasons not relevant here, an Amended Judgment was later entered, reducing the amount that Travelers owed to Blackstone to $117,861.25, and awarding Blackstone prejudgment interest on the overpayment at the legal rate of eight percent, as well as court costs. Travelers appealed to the Court of Appeals.

On October 17, 2007, the Court of Appeals rendered an opinion reversing the summary judgment granted to Blackstone. The Court of Appeals determined that while there was sufficient evidence to conclude that Thacker had voluntarily rejected workers' compensation coverage, the same could not be said for the other twenty-two employees who had filed rejection notices. The Court of Appeals wrote:

> In their depositions, Strawser merely testified concerning the general practice of Blackstone Mining in offering employees coverage under the Mass Mutual Policy, and Thacker primarily testified concerning the circumstances surrounding his rejection of workers' compensation coverage. However, there was a complete lack of evidence demonstrating whether each of the remaining individual employees who rejected coverage possessed a substantial understanding of the nature of the action and its consequences. Most strikingly absent from the record was an affidavit or deposition of any other employee who rejected coverage. Upon the whole, we conclude that Blackstone Mining failed in its burden of producing evidence that each of the twenty-three employees possessed a substantial understanding of the nature of the action (rejection of coverage) and its consequences and, thus, failed to prove that these employees voluntarily rejected workers' compensation coverage. Consequently, the circuit court erred by rendering summary judgment as a matter of law that all twenty-three employees voluntarily rejected workers' compensation coverage.

We granted discretionary review to examine the Court of Appeals' assignment of the burden of proof in its summary judgment analysis. As further explained below, we conclude that the Court of Appeals failed to comply with the burden of proof principles contained in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991) and its progeny. More specifically, the court failed to credit the presumptive validity of the signed rejection notices, and, correspondingly, failed to recognize that the burden shifted to Travelers to present affirmative evidence sufficient to show that there was an issue of fact regarding the validity of the notices. Accordingly, we reverse the decision of the Court of Appeals, and reinstate the judgment of the trial court.

## BLACKSTONE WAS ENTITLED TO SUMMARY JUDGMENT

Blackstone contends that the Court of Appeals erroneously reversed the trial court's award of summary judgment. It argues that, in light of the signed rejection notices, the burden on summary judgment shifted to Travelers to produce affirmative evidence demonstrating that the rejections were not made voluntarily, and that Travelers failed to do so.

The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR 56.03. "The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be

7

granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (citing *Steelvest* 807 S.W.2d at 480-82). "The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present 'at least some affirmative evidence showing that there is a genuine issue of material fact for trial.'" *Id.* at 436 (citing *Steelvest*, 807 S.W.2d at 482). The trial court "must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists." *Steelvest*, 807 S.W.2d at 480. The word "impossible," as set forth in the standard for summary judgment, is meant to be "used in a practical sense, not in an absolute sense." *Lewis*, 56 S.W.3d at 436 (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992)). "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo." *Id.* at 436.

With the foregoing summary judgment standards in mind, we now turn to the merits of the case. We first examine KRS 342.395, which provides the method by which employees may opt to reject workers' compensation coverage. The statute provides as follows:

> (1) Where an employer is subject to this chapter, then every employee of that employer, as a part of his contract of hiring or who may be employed at the time of the acceptance of the provisions of this chapter by the employer, shall be deemed to have accepted all the provisions of this chapter and shall be bound thereby unless he shall have filed, prior to the injury or incurrence of occupational disease, written notice to the contrary with the

8

employer; and the acceptance shall include all of the provisions of this chapter with respect to traumatic personal injury, silicosis, and any other occupational disease. However, before an employee's written notice of rejection shall be considered effective, the employer shall file the employee's notice of rejection with the Office of Workers' Claims. *The executive director of that office shall not give effect to any rejection of this chapter not voluntarily made by the employee.* If an employee withdraws his rejection, the employer shall notify the executive director.

(2) An employer shall not require an employee to execute a rejection of this chapter as either a condition to obtain employment or a condition to maintain employment. An employer shall not terminate an employee for refusal to execute a rejection of this chapter.

(3) Until notice to the contrary as specified in subsection (1) of this section is given to the employer, the measure of liability of the employer shall be determined according to the compensation provisions of this chapter. Any employee, may, without prejudice to any existing right or claim, withdraw his election to reject this chapter by filing with the employer a written notice of withdrawal, stating the date when the withdrawal is to become effective. Following the filing of that notice, the status of the party withdrawing shall become the same as if the former election to reject this chapter had not been made, except that withdrawal shall not be effective as to any injury sustained or disease incurred less than one (1) week after the notice is filed.

(emphasis added).

Central to an employee's rejection of workers' compensation benefits under the statute is that the rejection be voluntary. "[F]or a rejection to be voluntary, a worker must have a substantial understanding of the nature of the action and its consequences." *Watts v. Newberg*, 920 S.W.2d 59, 61 (Ky. 1996) (holding that an employer's requiring an employee to choose whether to take a twenty percent cut in pay and keep workers' compensation benefits or choose to reject statutory coverage and substitute lesser benefits to keep same wages

9

was not a substantial or meaningful choice and rendered the employee's rejection of workers' compensation coverage involuntary and in violation of the principle that the employer bear responsibility for paying workers' compensation insurance coverage, particularly when employee thought substitute coverage was as good as workers' compensation coverage); *Karst Robbins Machine Shop, Inc. v. Caudill*, 779 S.W.2d 207, 209 (Ky. 1989) (holding that a rejection notice filed by an illiterate employee was not voluntary because he did not understand the nature and consequences of his actions); *see also Tri-Gem Coal Co. v. Whitaker*, 661 S.W.2d 785 (Ky. App. 1983) (evidence that indicated that employment was conditioned upon rejection of the Workers' Compensation Act was of sufficient quality and quantity to support decision of the Workers' Compensation Board that employee's rejection was not voluntary).

It is not disputed that twenty-three Blackstone Mining employees executed the proper Department of Workers' Claims forms to reject workers' compensation coverage, and that the forms were properly filed with the agency and recorded.[4] "It is the settled law in Kentucky that one who signs a contract

---

[4] Because acceptance of coverage under the Workers' Compensation Act is nearly universal, and rejection of coverage is correspondingly rare, it is easy to minimize the importance of KRS 342.395 and its preservation of the right to reject coverage. The employee's ability to opt out of workers' compensation coverage is not merely an incidental feature of the Workers' Compensation Act; it is one of the constitutional cornerstones of Kentucky's workers' compensation scheme. As originally enacted in 1914, coverage under the act (then known as the "Workmen's Compensation Act") was compulsory. Employees had no choice but to accept coverage under the statute and forfeit their common law rights under tort law. Consequently, the Act was found to be in violation of § 54 of the Kentucky Constitution and declared unconstitutional in *Kentucky State Journal Co. v. Workmen's Compensation Bd.*, 161 Ky. 562, 170 S.W. 1166 (1914), opinion modified, 162 Ky. 387, 172 S.W. 674 (1914). In 1916, the General Assembly revised the law to give employees the option to elect or reject coverage under the Act. Because of that option, the constitutionality of the

is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud." *Clark v. Brewer*, 329 S.W.2d 384, 386 (Ky. 1959). This principle has been applied in the workers' compensation context. *Kentucky Road Oiling Co. v. Sharp*, 257 Ky. 378, 78 S.W.2d 38, 42 (1934) ("It is a rule in this state that a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract, unless he is misled as to the nature of the writing which he signs, or his signature is obtained by fraud.").

It follows that substantial weight must be accorded to the signed rejection forms executed by the twenty-three employees – weight at least equal to a presumption of validity. As previously noted, the rejection forms signed by the employees included the language "I Hereby Notify My Employer . . . That I do not accept, and do not want to work under the provisions of Kentucky Revised Statutes Chapter 342, commonly known as the Workers' Compensation Act of Kentucky." The import of this language could not be clearer, and there is no reason to suppose that any employee did not understand the provisions of the rejection notice. Without the presumption of validity, the signed rejection notices on file with the Department of Workers' Claims could not be considered a reliable or useful indicator of who was

---

1916 law was upheld in *Greene v. Caldwell*, 170 Ky. 571, 186 S.W. 648 (1916). "Our Workmen's Compensation Act is optional or elective rather than compulsory. The relationship established is contractual in nature. This is necessary in order for the Act to stand the test of constitutionality." *McNeese Const. Co. v. Harris*, 273 S.W.2d 355, 357 (Ky. 1954).

11

covered under the workers' compensation statutes, and in each instance some additional evidence from the employee would have to be gathered before the Department could place any degree of confidence in rejection forms filed with it. Through the signed rejection forms, Blackstone met its "initial burden of showing that no genuine issue of material fact exists," *Lewis*, 56 S.W.3d at 436, on the issue of whether the relevant employees had voluntarily rejected workers' compensation coverage. Given the presumptive validity of the signed rejection forms, Blackstone had no "burden," as suggested by the Court of Appeals, "of producing [any additional] evidence that each of the twenty-three employees possessed a substantial understanding of the nature of the action (rejection of coverage) and its consequences." The Court of Appeals erred in concluding that Blackstone "failed to prove that these employees voluntarily rejected workers' compensation coverage." To the contrary, by introducing the signed notices alone, Blackstone's motion for summary judgment was "properly supported." It was then incumbent upon Travelers to come forward with some evidence casting doubt on the validity of the rejection notices. "[A] party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest*, 807 S.W.2d at 482.

In opposition to Blackstone's motion for summary judgment, and in support of its own motion, Travelers did little more than criticize the circumstances surrounding the rejections. Specifically, Travelers alleged that the employees were designated as officers of the company solely to qualify for

12

the Mass Mutual coverage, and that the appointments were therefore invalid, thus nullifying coverage under the policies; that the employees were subjected to a presentation in support of the policy by a Mass Mutual sales agent which, it speculates, may have been misleading; and that Blackstone was engaging in an improper scheme to reduce its workers' compensation premiums. Such allegations, while perhaps identifying an unorthodox approach to satisfying the requirements of KRS Chapter 342, do not amount to affirmative evidence against the presumptive validity of the signed notices so as to raise a genuine issue of fact about the matter. Designed to be narrow and exacting so as to preserve one's right to trial by jury, summary judgment is nevertheless appropriate in cases where the nonmoving party relies on little more than "speculation and supposition" to support his claims. *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006). "The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 199 (Ky. 2001). Travelers's arguments amount to no more than speculation and reliance on its own unsupported claims. It has identified no specific employee who claims that his rejection was not voluntary, nor has it presented any affirmative evidence that any employee was subjected to fraud or coercion that may have rendered his rejection invalid, or that any employee was illiterate, incompetent, or otherwise unable to understand the consequences of his rejection.

13

In support of its position, Travelers directs our attention to *Watts*, 920 S.W.2d 59, and *Karst Robbins*, 779 S.W.2d 207; however, those cases are distinguishable. Both *Watts* and *Karst* involved an employee asserting on his own behalf that his formal rejection of workers' compensation benefits was not voluntary. As illustrated by those cases and *Tri-Gem Coal Co.*, 661 S.W.2d 785, in the usual situation, if accompanied by circumstances which demonstrate illiteracy, fraud, coercion, or a lack of understanding, an employee's averment that his rejection was not voluntary will, by itself, be sufficient to defeat summary judgment. Even in those cases, however, the presumed validity of the formal rejection notice will prevail unless refuted by affirmative evidence to the contrary. Ordinarily, such evidence is easily supplied by the employee himself. In this case, however, no employee claimed that his rejection was not voluntary, and Travelers's opposition to Blackstone's motion depended on its own speculations and interpretations of the facts, none of which demonstrated the existence of a genuine issue of fact regarding the validity of the employees' rejection of workers' compensation coverage.

We do not, as the dissent asserts, *find* that the rejections were voluntarily made. We simply state that Blackstone met its threshold burden for obtaining summary judgment by proffering the twenty-three presumptively valid notices of rejection of workers' compensation coverage. Travelers presented nothing to affirmatively establish the existence of a genuine issue of material fact concerning the voluntariness of the rejection notices. Therefore, Blackstone was properly granted summary judgment.

14

As a final observation, we highlight the fact that this opinion addresses only certain procedural elements of summary judgment under CR 56, and the allocation of the burden attendant thereto. The conclusion that Blackstone was entitled to summary judgment should not be construed as an endorsement of Blackstone's method of avoiding the apparently more costly premiums of a true workers' compensation policy, nor should it be construed as a finding that the Mass Mutual policy is a desirable or acceptable substitute for the workers' compensation coverage as mandated by KRS Chapter 342. Such a comparison is beyond the scope of our review. We express no opinion on the wisdom of rejecting the protections and benefits provided under the Worker's Compensation Act.

## BLACK LUNG AND PREJUDGMENT INTEREST ISSUES

In its reply brief, Travelers argues that if the holding of the Court of Appeals is reversed, we must then decide whether the trial court correctly ruled that Blackstone Mining did not owe premiums relating to black lung benefits and whether pre-judgment interest should have been assessed. Travelers raised the black lung and pre-judgment interest issues in its direct appeal to the Court of Appeals. However, because the Court of Appeals reversed the trial court on the summary judgment issue, it did not address these arguments.

Until recently, "[i]t [wa]s the rule in this jurisdiction that issues raised on appeal but not decided will be treated as settled against the appellant in that court upon subsequent appeals unless the issue is preserved by cross-motion for discretionary review." *Commonwealth, Transportation Cabinet Department*

15

*of Highways v. Taub*, 766 S.W.2d 49, 51-52 (Ky. 1988). However, we recently held that "to the extent that *Taub* requires a *prevailing party* to file a cross-motion for discretionary review on issues raised but not addressed by the Court of Appeals, it is overruled." *Fischer v. Fischer*, 2009-SC-000245-DG, 2011 WL 1087156, at *14 (Ky. Mar. 24, 2011). This holding stemmed from the idea that *Taub* was based on the untenable fiction that issues raised but not decided at the Court of Appeals are treated as though decided against the winning party, which would require a cross-motion for discretionary review to this Court to maintain those issues upon the grant of discretionary review. *Id.* at *9.

Of course, this case differs somewhat from *Fischer*, since Travelers is not asking that the Court of Appeals' decision be affirmed for other reasons. The black lung and pre-judgment interest issues were wholly independent ones that the Court of Appeals declined to address because it could not get to them after reversing the trial court's summary judgment. Nevertheless, *Taub*, or what remains of it, cannot serve as a bar to having those issues heard. While the idea that some unaddressed issues are treated as decided against a party still exists in our law, the concept is limited only to instances where the party that can raise the issue lost at the lower court. As pointed out in *Fischer*, the usual rule is that an "appellate court's failure to address the issue is treated as an implicit decision against the position raised by the losing party. The theory underlying this approach is that if the appellate court had considered the issue to be meritorious, the court would have reached a different result . . . ." *Id.* at

16

*10. This applies where the party seeks to raise multiple, co-equal issues that would independently control the outcome of the case. If the unaddressed claim would have required a certain outcome, then a decision reaching a different outcome necessarily rejects, albeit implicitly, the proposed claim. The failure to then raise those issues in a motion for discretionary review leaves the lower court's implicit decision intact, and that decision become a type of law of the case and binds the parties.

This remaining presumption does not apply, however, because Travelers *won* at the Court of Appeals in this case. Moreover, none of the undecided issues would have required a different outcome, which means they cannot be treated as implicitly decided against either party.

Nevertheless, because the prejudgment interest and black lung issues have not been the subject of a cross-motion for discretionary review, and are not independent grounds for affirming the result of the Court of Appeals, the best approach is to remand to the Court of Appeals to address those issues, rather than deciding their merits here. We do not have the benefit of full briefing of those issues, as they were raised for the first time in a reply brief. On remand, the parties can fully flesh out the remaining issues, and the Court of Appeals will be able to give them a full hearing.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Appeals is reversed, and the judgment of the Pike Circuit Court is, accordingly, reinstated to the extent that it finds the workers' compensation rejections voluntary and

17

Blackstone overpaid its premiums as a result. We remand to the Court of Appeals to consider the other issues that Travelers raised in its initial appeal that were not addressed by that court's prior opinion.

Minton, C.J., Abramson, Cunningham, Noble, and Schroder, JJ., concur. Scott, J., dissents by separate opinion.

SCOTT, J., DISSENTING: I must necessarily dissent from the majority's opinion because the opinion endangers the financial footing of the Kentucky Workers' Compensation Act ("Act"), KRS 342.0011, et seq., in that it misperceives the evidentiary basis necessary under *Steelvest, Inc. v. Scansteel Serv. Ctr.*, Inc., 807 S.W.2d 476 (Ky. 1991) and its progeny, for a finding that an employee has voluntarily rejected coverage under the Act. In fact, the evidentiary basis for a summary judgment finding that an employee has voluntarily rejected coverage under the Act is much greater than the majority surmises and cannot be met by the evidence adduced to date in this case.

Thus, I fear the majority's decision will, in the future, severely reduce the premiums paid to support Kentucky's workers' compensation program, while, at the same time, Kentucky's compensation carriers are required by statute to assume the *entire* workers' compensation liability of the employer, KRS 342.375, even though the true voluntariness of an employee's rejection will not be determined until a later date when he or she files a claim. By this time, of course, a good number of the "fly by night" employers seeking means by which to avoid payment of their full compensation premiums will be gone or

18

insolvent—leaving the unfunded liability to the compensation carriers that support Kentucky's program.

Like other states', Kentucky's workers' compensation program "is social legislation, the purpose of which is to compensate workers who are injured in the course of their employment for necessary medical treatment and for a loss of wage-earning capacity, without regard to fault." *Adkins v. R & S Body Co.*, 58 S.W.3d 428, 430 (Ky. 2001). Thus, "[t]he statutory language should be liberally construed to promote the objectives and carry out the intent of the legislature." Ronald W. Eades, 18 Ky. Prac., Workers' Comp. § 1:3 (2010-2011). "This principle of protecting the interests of the injured worker is [the] basic tenet of workers' compensation law." *Id.* As this Court noted in *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows*:

> It is an important public interest that injured employees shall receive, and employers shall be obligated to pay, for medical expenses, rehabilitative services and a portion of lost wages. Injured employees should not become public charges. If that is the public policy of Kentucky, and it is, then action on the part of an employer which prevents an employee from asserting his statutory right to medical treatment and compensation violates that policy.

666 S.W.2d 730, 733-34 (Ky. 1983). Inherent in this statutory scheme are payment of workers' medical benefits, KRS 342.020, both temporary and permanent, partial and total income benefits (including rehabilitation and retraining rights), KRS 342.040, 342.710, 342.732, and 342.730, as well as death and survivor benefits, KRS 342.730(3), 342.750.

Significant to this scheme:

19

Every employer under [the Act] shall either insure and keep insured its liability for compensation . . . in some corporation, association, or organization authorized to transact the business of workers' compensation insurance in this state or shall furnish to the commissioner satisfactory proof of its financial ability to pay directly the compensation in the amount and manner and when due as provided for in this chapter. In the latter case, the commissioner shall require the deposit of an acceptable security, indemnity, or bond to secure, to the extent the commissioner directs, the payment of compensation liabilities as they are incurred.

KRS 342.340. Moreover,

KRS 342.365 requires that a carrier issuing a policy against liability under [the Act] must agree to pay promptly "all benefits conferred by this chapter and all installments of the compensation that may be awarded or agreed upon" and that the carrier's agreement "shall be construed to be a direct promise by the insurer to the person entitled to compensation, enforceable in his name." KRS 342.375 provides that every policy or contract of insurance "shall cover *the entire liability of the employer* for compensation to each employee subject to [the Act].

*AIG/AIU Ins. Co. v. South Akers Mining Co., LLC*, 192 S.W.3d 687, 688 (Ky. 2006) (emphasis added). "This assures that injured workers or their surviving dependents will receive all of the benefits to which they are entitled." *Id.*

Admittedly, KRS 342.395(1) allows an employee to reject coverage under the Act, but such an election is *never* effective unless it is, in fact, made voluntarily. KRS 342.395(1) ("The commissioner . . . shall not give effect to any rejection of this chapter not voluntarily made by the employee."). Moreover, "[a]n employer shall not require an employee to execute a rejection of this chapter as either a condition to obtain employment or a condition to maintain employment." KRS 342.395(2). Thus, to be effective, an employee's rejection of

20

coverage under the Act requires much more than just a decision, an execution, and transmittal of the written notice.

The prerequisites for a voluntary rejection were first analyzed in *Tri-Gem Coal Co. v. Whitaker*, 661 S.W.2d 785 (Ky. App. 1983). In *Whitaker*, the worker "testified that he read and understood the form and was aware that he was rejecting workers' compensation coverage. He also testified that he understood accident coverage would be provided by Great Fidelity Insurance Company." *Id.* at 785. Several months later, however, he sustained an injury at work which left him almost sightless in his left eye. Thereafter, he filed a claim with the Workers' Compensation Board which found that he *had not voluntarily* rejected workers' compensation coverage and awarded benefits to him based on a 50% occupational disability." *Id.* at 785-86 (emphasis added).

Although the employee testified that signing the rejection form was a prerequisite to employment and several other employees testified to the same effect, there was

> [A]lso testimony from other employees that either a representative from the insurance company or a supervisor for Tri-Gem presented information comparing benefits under the Great Fidelity policy to benefits under the Act. They were to choose between the two coverages. *They testified that they, as a group, chose the Great Fidelity plan* because the benefits were better than those under the Act.

*Id.* at 786 (emphasis added). In finding "[t]he evidence as a whole is of sufficient quality and quantity to support the decision of the Board that Whitaker's rejection was not voluntary," the court noted:

21

> There is no authority, statutory or otherwise, providing guidelines to determine whether a rejection is voluntarily made. The Board relied on an opinion by the Attorney General, OAG 77-527, which concluded that *it would be highly unusual for every employee to reject the Act, and that such a situation could indicate that employment was conditioned upon rejection.* Obviously this type rejection would not be a voluntary one as contemplated by the statute.

*Id.* at 786 (emphasis added).

We next addressed the issue in *Karst Robbins Mach. Shop, Inc. v. Caudill,* 779 S.W.2d 207 (Ky. 1989). In *Caudill,* we noted "[t]hat Caudill, under no coercion, did sign the Form 4 notice of rejection was not disputed; but the evidence conflicted as to whether this employee, possessed of 'extremely limited literary skills,' executed the document with an *informed understanding of its import sufficient to render his rejection truly voluntary.*" *Id.* at 208 (emphasis added). In affirming the Court of Appeals in its belief that the rejection was *not* voluntary, we held:

> It is not dispositive, in our view, to decide that the *signature* was freely given; the statute requires that *rejection* of the act be voluntary. Like the Court of Appeals, we believe that among the elements of a voluntary rejection, as contemplated by the legislature, is a substantial understanding of the nature of the action and its consequences.

*Id.* at 208-09.

We again considered the issue in *Watts v. Newberg,* 920 S.W.2d 59 (Ky. 1996). In *Newberg,*

> [T]he employer gave [the] claimant and fellow employees . . . the choice of remaining on the employer's workers' compensation coverage with a 20 percent reduction in wages or rejecting the

22

provisions of the Workers' Compensation Act and accepting a new employer-provided benefit package with no decrease in wages. *The meeting with the employees resulted in the wholesale signing of rejection notices by the employees.*

*Id.* at 59 (emphasis added). Thereafter, the worker filed a workers' compensation claim for disability benefits due to a work-related injury occurring after his alleged rejection. The compensation carrier (through the employer) then raised the defense that he had executed and filed a written notice of rejection which excluded him from coverage under the employer's workers' compensation insurance. The claimant responded by arguing that his rejection was *not voluntary*, and, therefore, did not constitute a valid rejection. In his action, the claimant acknowledged:

> [T]hat he understood that the insurance offered as a substitute for workers' compensation coverage was promoted as being just as good as workers' compensation coverage, although, in reality, the new policy did not provide for any benefits for partial disability. This being the case, claimant contended that he would not have knowingly waived his right to recover for permanent partial disability in lieu of a policy providing only for benefits for total disability. In addition, he argued that the employer did not set forth the differences between workers' compensation coverage and the proposed disability coverage so as to allow him to gain a substantial understanding of the consequences of signing the rejection.

*Id.* at 60. Analyzing the contrasting evidence introduced, we held that: "[t]he evidence in this case shows that claimant did not have a substantial understanding of the effect of his rejection, as he understood that the substitute coverage offered by the employer was just as good as coverage under the Workers' Compensation Act." *Id.* at 61.

23

The progression of our analysis of the requirements necessary for a finding of a "voluntary rejection" of coverage under the Act as discussed above, is significant in two respects. First, the worker's rejection requires more than the execution and transmittal of the rejection form—the worker "must have a substantial understanding of the nature of the action and its consequences." *Id.* Secondly, such a determination does not normally occur until many years later, following the employee's realization of the detriments of his or her election and his or her pursuit of the appropriate compensation claim. This, of course, is after the dissipation of the coercive elements surrounding the initial rejection. It should not go unnoticed that in each of the cases discussed above, the workers' compensation carrier contested (in the employer's name) its obligation of coverage to the rejecting worker and, in each case, it lost.

Thus, in instances such as are addressed by the majority in this case, we have three interrelated components of Kentucky's compensation scheme. First, the employer *must* be covered or be an approved self-insured. KRS 342.340(1). Secondly, the scheme is financially supported by employer premiums paid to the participating carriers, along with special fund assessments on these premiums. *See* KRS 342.0011(24), (25), and (28); KRS 342.122(1).[5] And, thirdly, each worker must have a protected right to voluntarily reject such coverage. KRS 342.395; *see also Plunkett v. Jones*, 452 S.W.2d 373, 374 (Ky.

---

[5] Additionally, the Special Fund is currently being supported by coal severance tax revenues. *Beshear v. Haydon Bridge Co., Inc.*, 304 S.W.3d 682 (Ky. 2010).

24

1970) ("The original Workmen's Compensation Act was held to be unconstitutional because of its compulsory aspects.").

Thus, in order to maintain a viable statutory scheme covering Kentucky's workers, all the interrelated elements must be kept in balance. Participation must be such as to keep the employers' premiums at an affordable level, while also sufficient to support the participating workers' compensation carriers that basically administer the program. More importantly, the premiums must be such as to support medical, income, rehabilitative, and retraining needs of the injured workers, as well as death benefits to their survivors, while, at the same time, protecting the right of the worker to make a true, voluntary rejection of coverage under the program, when a fair determination is made that it is, in fact, their informed choice.

My complaint with the majority opinion is that it upsets this precarious balance by allowing an employer—without presenting proof of each individual's voluntary and informed rejection—to reduce its premiums to a level incapable of sustaining a compensation program statewide, while, at the same time, the participating carriers, by virtue of KRS 342.375, have to accept the liabilities of coverage for *each* of the employer's workers, who are *later found* to have been coerced or misled in their rejections.

It is this divergence between the majority's summary judgment standard announced here—which excuses employers' premiums—and our "voluntariness" standard established for compensation review, which then

traps the carrier into a coverage for which it has not been compensated—that endangers Kentucky's compensation coverage of its workers.

The majority inadvertently creates this divergence by its approval of the trial court's grant of summary judgment on behalf of Blackstone Mining, by misapplying *Steelvest,* 807 S.W.2d 476, and by holding that the Court of Appeals *"failed to credit the presumptive validity of the signed rejection notices,* and, correspondingly, failed to recognize that the burden shifted to Travelers to present affirmative evidence sufficient to show that there was an issue of fact regarding the validity of the notices." (Emphasis added).

The majority applies *Steelvest* as if it *validated* the federal practice of summary judgments. In fact, it did not! Under the federal standard, the initial burden of showing that no genuine issue of material fact exists:

> [D]oes not necessarily require the movant to produce evidence showing the absence of a genuine issue of material fact, but only that he show that there is an absence of evidence possessed by the respondent to support an essential element of his case. [Yet, u]nder the present practice of Kentucky courts, the movant must convince the court, by the evidence of record, of the nonexistence of an issue of material fact.

> Secondly, under the federal scheme, the test for summary judgment is the same as that for a directed verdict. In Kentucky, we have clearly held that the consideration to be given to the two motions is not the same and that a ruling on a summary judgment is a more delicate matter and that its inquiry requires a greater judicial determination and discretion since it takes the case away from the trier of fact before the evidence is actually heard.

> Thirdly, under the federal summary judgment standard, the "scintilla" rule applies and summary judgment will be granted to the movant unless there is evidence on which a jury could

reasonably return a verdict in the respondent's favor. Under the Kentucky standard, we conclude that the movant should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy. See, Isaacs v. Cox, Ky., 431 S.W.2d 494 (1968). Only when it appears *impossible* for the nonmoving party to produce evidence at trial warranting a judgment in his favor should the motion for summary judgment be granted.

Finally, under both the Kentucky and the federal approach, a party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial.

*Id.* (internal citations omitted, emphasis added). Moreover, "[t]he trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor." *Lewis v. B & R Corporation*, 56 S.W.3d 432, 436 (Ky. App. 2001) (*citing Steelvest*, 807 S.W.2d at 480-82).

Here, the evidence of record established that of Blackstone Mining Company's thirty employees, *twenty-three* signed forms rejecting coverage under the Act. These twenty-three employees tendering rejection notices received substitute coverage under a disability income policy issued by Massachusetts Mutual Life Insurance Company (policy). Yet, this policy does "not provide any benefit for any injury or sickness which existed during the 12 months before the issue date"; nor, are benefits "allowed under this policy if disability is due to a cause which is not covered." Moreover, the policy

contains additional limitations for pre-existing conditions in an attached rider,

which provides:

This rider does not provide any benefit for any disability which begins within two years after the Issue Date of this rider if:

- That disability is caused, or contributed to, by any injury which occurred or sickness which first manifested itself before that Issue date; and

- The injury or sickness was not disclosed in the application for this rider.

For the purpose of this provision "injury" and "sickness" shall mean only those for which, during the 12 months before the Issue Date of this rider:

- Medical advice or treatment was recommended by or received from a physician; or

- The Insured had symptoms that would cause an ordinarily prudent person to seek diagnosis, care, or treatment.

If disability begins after two years from the Issue Date of this rider, we will not reduce or deny a claim for benefits on the ground that a disease or physical condition had existed before that Issue Date. However, if that disease or physical condition was excluded by name or specific description when disability began, then that exclusion will apply.

Additionally, under the policy, disability income payments are measured

by the loss of income actually suffered by the worker, with the exception that

only losses of twenty percent or greater are payable. Nor does his policy

28

provide for payments of medical benefits.[6] Thus, contrasting with the coverages required for workers' compensation policies, the Massachusetts Mutual policy does not provide disability income payments for permanent or partial disabilities unrelated to income loss. This contrasts directly with the claimant's position in *Newberg*, that "he would not have knowingly waived his right to recover for permanent partial disability in lieu of a policy providing only for benefits for total disability." 920 S.W.2d at 60.

In fact, looking at the evidence in a light most favorable to the opposing party—Travelers—the fact that twenty-three of the thirty employees of the company filed rejection forms indicates, at a minimum, company involvement in the rejections. Yet, the majority ignores the evidentiary implication of this fact even though large-scale rejections have been legally recognized as a badge (indicator) of improper company involvement. OAG 77-527, OAG 78-465 ("The Workmen's Compensation Board shall not give effect to any rejection of this chapter not voluntarily made by the employee."). Moreover, the fact that most of the jobs available at Blackstone were at an executive level indicates that these were competitive premium positions to be sought after by the available and qualified workforce. This is aside from the question of whether the Massachusetts Mutual policy covers "black lung" benefits. The policy does not even mention "black lung."

---

[6] As the parties did not discuss this aspect in their briefs, it is not known whether there were other insurance policies providing medical benefits.

As to why the twenty-three rejected coverage, only Blackstone's president and one of its other officers gave deposition testimony on this during discovery. The president testified that his employees were given an unqualified choice, while the officer, Dean Thacker, testified that he evaluated the two options and voluntarily chose Massachusetts Mutual as the better plan. No other evidence was presented as to why each of the twenty-two other employees rejected the policy, or whether, in fact, each employee had a "substantial understanding of the nature of [his] action and its consequences." *Newberg*, 920 S.W.2d at 61.

This leaves us in a situation where twenty-two of the twenty-three employees are free in the future to file workers' compensation claims in the event they can prove they *did not understand* the consequences of their selection.[7] To the extent this occurs, Travelers will then *have* to pay their benefits because its policy is statutorily mandated to cover the entire liability of Blackstone Mining. KRS 342.375. This is the case even though Travelers has not received any premiums for this risk of coverage—and, in the event that Blackstone Mining is insolvent or no longer in existence at the time of the claim, Travelers will never recover the premiums.

Thus, by affirming the trial court's summary judgment finding that *all* of the rejections were *voluntary* based only upon the testimony of Blackstone's president and one of its officers (one of the twenty-three), the majority has, in fact, adopted a standard of proof for the voluntariness of a rejection *different*

---

[7] Presumably, estoppel would bar the company officer, Dean Thacker, who did testify.

than the one we actually employ in compensation cases to determine whether or not the rejection was voluntary.

Of course, one could argue that every compensation carrier could take a pre-emptive action similar to Travelers and then take every rejecting employee's deposition to establish an estoppel bar for future claims. Yet, such an argument imposes a costly enforcement option on the participating compensation carriers alien to the statutory scheme, not to mention the evidentiary burden. It also imposes it during the work relationship, when the coercive atmosphere is still likely to exist and constrain the employee's testimony.

The better standard, and one consistent with our current compensation standard, would be to require the employer, if questioned, to produce proof of *each individual's reasons*, and each employee's understanding of the consequences of the rejection, and, then, were the Court to make a determination that the premium was not due because the rejection was, in fact, voluntary based upon the testimony of the employee, the employee would be estopped to challenge the determination at a later date. This way, the employer would not have to pay the premiums and the compensation carrier would not have to carry the statutorily mandated, yet unfunded, risk of coverage. Moreover, the cost to the employer to produce such evidence would be much lower than that of the carrier.[8] Only such a consistent standard can maintain

---

[8] No affidavits or depositions of the twenty-two other employees were submitted of record in this case.

31

the status quo, and the balance necessary for an effective workers'

compensation program in Kentucky.

Thus, I would affirm the Court of Appeals' and remand this matter to the

trial court for further proceedings.[9]

COUNSEL FOR APPELLANT:

Fredrick G. Irtz II
PO Box 22777
Lexington, Kentucky 40522

COUNSEL FOR APPELLEE:

William Kenneth Burnham
Ronald Sheffer
Sheffer Law Firm, LLC
101 South Fifth Street, Suite 1450
Louisville, Kentucky 40202

---

[9] Upon a remand, the summary judgment for the two employees testifying could stand, yet, until the final conclusion of the matter, they would remain interlocutory decisions.

# Supreme Court of Kentucky

## 2009-SC-000015-DG

BLACKSTONE MINING COMPANY                                        APPELLANT

                    ON REVIEW FROM COURT OF APPEALS
V.                       CASE NO. 2007-CA-001610-MR
                    PIKE CIRCUIT COURT NO. 97-CI-00684

TRAVELERS INSURANCE COMPANY                                       APPELLEE

## ORDER DENYING PETITION FOR REHEARING
## AND
## GRANTING MODIFICATION OF OPINION

The petition for rehearing or extension of the decision filed by appellee,

Travelers Insurance Company, is hereby DENIED.

The petition for modification filed by appellee is GRANTED and this

Court hereby modifies the opinion rendered on December 16, 2010 through the

deletion and addition of language within that opinion. Due to pagination, the

attached published opinion substitutes in full for the previously rendered

opinion. Said modification does not affect the holding.

All sitting. All concur.

Entered: November 23, 2011.

                                                    _____
                                                          CHIEF JUSTICE