RENDERED: FEBRUARY 5, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0098-MR

ALEXANDER MORTON                                                    APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
ACTION NO. 16-CI-002567

LOUISVILLE METRO                                                     APPELLEE
GOVERNMENT

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: JONES, LAMBERT, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Alexander Morton was terminated as a corrections

officer at the Louisville-Jefferson County Jail after allegedly using excessive force

on two different inmates[1] in a fifteen-day span. Morton sued for wrongful

termination, but the Jefferson Circuit Court granted summary judgment to the

---

[1] We use the term inmates as that is how the parties' briefs refer to the two individuals upon
whom Morton used force, but it is not completely clear whether either/both had been convicted
of criminal offenses or were arrestees awaiting trial.

Louisville Metro Government (Louisville). We reverse because the record contains disputed issues of material fact.

Morton admits that on December 9, 2013, he struck an inmate.[2] It is uncontested that the inmate was being verbally abusive, including directing racial epithets towards Morton, who is African-American. But much of the rest of what happened on that date is disputed.

Morton testified at his deposition that the inmate was "[n]ot following orders[,]" had "resisted[,]" and "wasn't complying with my commands. When he was told to put his hands on his head, he took his hands off. I took that as an act of aggression." Morton testified at the deposition that he gave the inmate "[a] hard empty-hand strike" and "[a] knee strike as well."

Although Louisville stresses that the inmate was restrained, whether the inmate was handcuffed when Morton struck him is hazier in Morton's deposition testimony:

> Q. And was—[the inmate], was he handcuffed at the time?
>
> A. When we first put him—when we first put him in a cell, yes.
>
> Q. Did you take the restraints off at any time?

---

[2] According to the investigative report, the inmate "was released the same day this case was initiated" and did not respond to "[n]umerous messages" so he "was never interviewed for this case."

A. When we told him—when we had him get on the ground, we was [sic] about to exit the cell, we took his handcuffs off and told him to keep his hands on his head. And then, when he took his hands off, I took that as an act of aggression.

. . .

Q. Was he under any form of restraint at the time that you struck him?

A. When he was taking his hands off his head, no.

Q. Did he have leg restraints on or just nothing—

A. Just regular handcuffs.

At an unemployment hearing, Morton testified to a different version of the events, seeming to base his decision to strike the inmate on the inmate's use of racial slurs:

We, uh, you know, we escorted him [the inmate] in the cell. We, uh, ordered him to his knees when we was [sic] giving him instructions on what to do when we take the handcuffs off. And at that point, the handcuffs was [sic] starting to come off or whatever, and he kept using the word—so, he kept using, you know, the "N" word against me, you know, whatever, so I—I gave him a strike to his—his right side. And after that, um, that was—that was all the force that was used on that incident.

In his sworn statement to the Louisville Metro Department of Corrections Professional Standards Unit (PSU), Morton related a third variation of the events. Morton admitted giving the inmate an "unnecessary" knee strike (in

contrast to his unemployment testimony about the strike to the inmate's right side being the only force used) because it had "'triggered' something inside of him" when the inmate used a particularly egregious racial slur. Morton also admitted administering "two hard empty hand strikes" to the inmate's head because the inmate "tried to get up from the floor after being instructed to stay down and to keep his hands on his head until the officers exited the cell" (which contrasts with his unemployment hearing testimony that he gave only one strike to the inmate's side and his deposition testimony that he gave "a" strike to the inmate's head).

Other officers took a dim view of Morton's actions. In a sworn PSU statement, Officer Evan McIntosh stated that he helped Morton escort a handcuffed, verbally abusive inmate to a single cell. When McIntosh told the inmate to go to his knees for the handcuffs to be removed, the inmate said, "what if I don't," after which Morton "delivered a knee strike" to the inmate's back. When the inmate still did not get on his knees, Morton "delivered a 'couple of punches'" to the inmate's back. McIntosh "felt the force Ofc. Morton used was inappropriate and . . . didn't feel Ofc. Morton's actions were right."

Similarly, Officer Kevin Hinton gave a sworn statement to PSU in which he stated Morton gave the inmate "a knee strike" and "two or three closed fist strikes[.]" Hinton stated the inmate "never posed a threat to anyone and [Hinton] wouldn't have struck" the inmate in that situation.

-4-

Morton also admits he made physical contact with an inmate fifteen days later, on December 24, 2013.[3] Again, however, the precise details of that encounter are not congruent among Morton and witnesses.

In his sworn statement to PSU, Morton recalled the handcuffed prisoner speaking vulgarly, including making inappropriate sexual and racial comments. According to Morton, the inmate complied when told to go to his knees but "started 'getting real squirmy'" and kept hurling offensive insults when officers began to release him from handcuffs. Morton stated that when Officer Charles Ennis, Jr. removed the inmate's right hand from the handcuffs, the inmate "tried to sit himself up some and turn towards him" and, since Morton did not know what the inmate "was going to do[,]" Morton "put his hand against [the inmate's] face because he didn't want [the inmate] to turn towards him." Morton admitted making a fist when he put his hand on the inmate's face because "he [Morton] had big hands and he didn't want [the inmate] to bite or spit on his hands." Morton denied striking the inmate more than once and admitted the inmate "was not a physical threat" which is why Morton "did nothing more than put his hand on [the inmate's] face."

---

[3] As with the previous incident, the PSU report notes that the inmate was not interviewed because he "was released from custody on December 26, 2013" and subsequently "checked himself into a mental health facility" where he was "unreachable for an interview."

Morton gave roughly similar sworn testimony at a grievance hearing and an unemployment hearing. In his arbitration testimony, Morton averred that when the handcuffs were being removed from the inmate he "started thrashing his body, being squirrely . . . and at that point, you know, from my angle, from my perspective, he started to kind of raise up and turn towards me. That's when I quickly reacted and put my fist to my [sic] face[.]" Similarly, Morton gave sworn testimony at an unemployment compensation hearing that "when that right handcuff was removed, that's when he [the inmate] started to raise his body up and look towards me. That's when I quickly put my fist to his face. I did not strike him multiple times to his face or body."

Officer Ennis gave a sworn statement to PSU, relaying that he helped Morton escort a handcuffed prisoner to a cell where Morton told the inmate, whom Ennis described as being "a little mouthy," to get on his knees. The inmate complied and "was not being physically aggressive or resisting in any way." But when they were going to remove the handcuffs, the inmate continued to be "verbally abusive[,]" whereupon Morton "just instantly attacked him [the inmate], started hitting him in the face" until Ennis pushed "him" (presumably Morton) back. Ennis stated that Morton struck the inmate "with his left fist at least twice." When the inmate continued hurling racial insults, Morton "hit [the inmate] two more times in the side" and "put his knee in [the inmate's] back and he came down

pretty hard with his weight when he did it." Ennis deemed Morton's use of force to be "both unnecessary and excessive." Similarly, Officer Christina Easton McNeese told PSU that Morton "either struck [the inmate] with his knee or he placed his knee on [the inmate's] back and applied pressure[,]" which McNeese did not think "was a necessary use of force" since the inmate "was under control at the time." However, another officer on the scene, Morris Ceja, told PSU that the inmate was making extremely racially derogatory comments, but Ceja did not see anyone strike the inmate or use excessive/unnecessary force.

In 2014, Morton was terminated. Morton's union filed a grievance on his behalf, arguing his termination was not supported by just cause, as required by the collective bargaining agreement (CBA), and was disproportionately excessive to the discipline imposed on others. The grievance eventually proceeded to arbitration, but in March 2016, the arbitrator found the termination did not violate the CBA.

Morton then filed this action against Louisville, raising two main issues in his amended complaint: breach of contract (the CBA) and retaliation/racial discrimination. Louisville eventually moved for summary judgment. On November 12, 2019, the trial court granted Morton's motion to file an amended complaint—the sole purpose of which was to drop his retaliation/racial discrimination claim. Nonetheless, the very next day, less than a

week before the trial was set to begin, the trial court issued an order granting Louisville's motion for summary judgment, but that order only discussed the already-dismissed retaliation claim.

Morton then filed a motion to alter, amend or vacate, correctly noting that the trial court had not addressed the breach of contract claim. In its response to the motion to alter, amend, or vacate, Louisville argued—apparently for the first time—that Morton lacked standing to allege a breach of the CBA because he was not a party to that contract.

In December 2019, the trial court denied Morton's motion to vacate. The trial court found that the CBA provided that termination was a permissible penalty for misconduct. It ruled that "[g]iven the serious nature of the accusation, dismissal was an appropriate and permissible sanction under the Collective Bargaining Agreement." The trial court also found that Morton lacked standing because "the grievance procedure set forth in the CBA is the exclusive remedy for deciding any grievance." Notably, the order does not mention that the trial court viewed the evidence in the light most favorable to Morton; indeed, it does not contain any substantive discussion of the facts. Morton then filed this appeal.

The overarching question before us is whether the trial court properly granted summary judgment to Louisville. But we first must address the trial court's conclusion that Morton lacked standing to sue for alleged violations of the

CBA because he was not a party to that contract since a lack of standing would inherently doom Morton's summary judgment arguments. *See Commonwealth ex rel. Beshear v. Commonwealth Office of the Governor ex rel. Bevin*, 498 S.W.3d 355, 360 (Ky. 2016).

Standing focuses on whether a party has a legally cognizable, "personal stake in the outcome of controversy." *Petition Committee by and Through a Majority of its Members v. Board of Education of Johnson County, Kentucky*, 509 S.W.3d 58, 63 (Ky.App. 2016). And, as a general matter, "the obligations arising out of a contract are due only to those with whom it is made; a contract cannot be enforced by a person who is not a party to it or in privity with it[.]" *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 579 (Ky. 2004) (quotation marks, citation, and footnote omitted). But that general rule is inapplicable here.

Although not discussed by the trial court, even prior to the Civil War, Kentucky recognized that "the party for whose sole benefit a contract is evidently made may sue thereon in his own name, although the engagement be not directly to or with him." *Allen v. Thomas*, 3 Met. 198, 60 Ky. 198, 199 (1860). That doctrine, which now is usually described as third-party standing, means that "a third party for whose benefit a contract is made may maintain an action thereon; however, he must have been a party to the consideration or the contract must have

been made for his benefit" because "the mere fact that he will be incidently benefited by the performance of the contract is not sufficient to entitle him to enforce it." *Ball v. Cecil*, 285 Ky. 438, 148 S.W.2d 273, 274 (1941). *See also Olshan Foundation Repair and Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky.App. 2009) (explaining third parties may seek to enforce the terms of a contract where they can prove it was intended to benefit them directly).

Here, the CBA was intended to benefit employees such as Morton. That conclusion is inescapable since Louisville Ordinance No. 095, Series 2012, which approved the 2012-2015 CBA at issue here, stated in relevant part that the CBA is "for and on behalf of bargaining unit employees within the Louisville Metro Corrections Department concerning . . . terms of employment, benefits and other matters[.]" Therefore, since the CBA was explicitly intended to benefit employees such as Morton, he has third-party standing.

Our conclusion is not swayed by *Brown v. Sterling Aluminum Products Corporation*, 365 F.2d 651 (8th Cir. 1966), the lone federal case cited by the trial court for its contrary conclusion. First, as a lower federal court decision (indeed, an extraterritorial one) it is not binding. *Bell v. Commonwealth*, 566 S.W.2d 785, 788 (Ky.App. 1978). Second, *Brown* actually supports Morton's position.

In *Brown*, the issue was whether a company violated a CBA by moving the location of the plant where the plaintiff-employees worked. The Eighth Circuit held that the employees lacked standing because they were attempting to enforce collective rights, but an individual could bring an action "seeking to enforce a right that is personal to him and vested in him at the time of the suit." *Brown*, 365 F.2d at 656-57. Since Morton is seeking to enforce his individual rights, his claims are not barred under *Brown*.

We further disagree that the CBA provides for arbitration to be "the exclusive remedy for deciding any grievance." The CBA neither states this, nor has Louisville or the trial court cited any authority in support of such a construction of its terms. Although factually distinguishable, we have issued at least one opinion on the merits of breach of contract claims regarding a CBA between Louisville and its employees (firefighters, in that case). *Metro Louisville/Jefferson County Government v. Abma*, 326 S.W.3d 1 (Ky.App. 2009). We cannot conclude the CBA bars Morton from exercising his otherwise constitutionally guaranteed right to access the courts to seek redress if not disciplined for "just cause."

Having determined that Morton has standing, we turn to whether summary judgment on the merits was proper. When we review a trial court's decision to grant summary judgment, the question is:

-11-

whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor . . . . The word impossible . . . is meant to be used in a practical sense, not in an absolute sense. Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo.

*Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 198 (Ky. 2010) (internal quotation marks and citations omitted).

As Morton notes, the trial court's decision on the breach of contract claim does not state that it examined the evidence according to the exacting summary judgment standards. In fact, it does not contain any discussion of the record. When we view the record in the light most favorable to Morton considering all material factual disputes in his favor, it is plain that summary judgment is precluded. Although it may be unlikely that Morton would prevail at trial (given the damning testimony of other officers and the inconsistencies in some of Morton's own testimony of events), such a result is not impossible.

As to the December 9 incident, Morton stated under oath that the inmate had resisted and was not following commands, including taking his hands off his head and trying to get up from the floor. Morton also alluded to the inmate

-12-

not being handcuffed when struck by Morton. On the other hand, Morton also gave sworn testimony which could be construed as stating that the inmate was still handcuffed when Morton struck him, and that Morton did so because the inmate called Morton a disgusting racial epithet. Morton was not consistent in stating how many times he struck the inmate, and at least once admitted he gave the inmate an unnecessary knee strike. Other officers also testified that Morton used unnecessary, inappropriate force against the inmate and made physical contact with the inmate more than once.

The record regarding the December 24 incident is similarly mixed. Morton testified that the partially handcuffed inmate was raising up and turning toward him, so Morton put his fist against the inmate's face once; other officers testified that Morton put his knee in the handcuffed inmate's back and struck the inmate's face more than once.

Frankly, Louisville's conclusion that Morton used excessive force twice within a span of fifteen days is aligned by the testimony of other officers. And, Morton's arguments to the contrary notwithstanding, using excessive force against an inmate twice in such a short time span—especially against a restrained inmate—would logically provide good cause for termination under the CBA. Even Morton's version of the events is not consistent, especially regarding the December 9 incident. But the purpose of summary judgment is not to award victory to

whichever party the court finds most believable or which has amassed the most evidence. Instead, a court must grant summary judgment *only* if it would be functionally impossible, not merely difficult, for a party to prevail at trial. *Ogden v. Employers Fire Ins. Co.*, 503 S.W.2d 727, 729 (Ky. 1973); *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991).

Here, a jury could choose to give more credence to Morton's statement(s) that the inmate(s) were fully or partially uncuffed and that each had failed to obey commands and made aggressive or threatening movements. According to Morton, his responsive use of force was permissible under Louisville's use of force policies. Under those circumstances, a reasonable juror could conclude Morton did not use excessive or unnecessary force one or both times, meaning there was not good cause for his termination. Since the evidence is disputed on some key areas, summary judgment is improper.

Finally, our conclusion that there are issues of disputed fact precluding summary judgment means we need not address the parties' sundry additional arguments at length. For example, Morton argues the investigation was flawed because it was not concluded within sixty days, as contemplated by the CBA. Morton also argues it was improper under the CBA and/or employee policies and procedures to terminate him without first using graduated sanctions. Again, the parties have not cited to where we may locate in the record either the

-14-

entire CBA or the entire policies and procedures for Louisville employees. But it appears to be undisputed that, as a general matter, graduated sanctions for misconduct are preferred and investigations of alleged misconduct should be concluded within sixty days. But, despite the trial court's statement to the contrary in its ruling, mere allegations—even serious ones—are insufficient to merit termination unless they are proven. And there is a dispute here as to whether the allegations were proven. If proven, however, egregious misconduct may result in termination, and Morton has not cited to anything mandating that an employee *must* be given a lesser sanction before being terminated or that an investigation lasting more than sixty days is invalid.

We also need not delve deeply into Morton's related argument that similarly situated employees were sanctioned less harshly. Morton has provided only a spreadsheet showing the discipline imposed on other employees but has not provided a full explanation of the facts and circumstances involved in those situations such that we can determine whether they truly were similarly situated (*i.e.*, that Morton was treated differently).

We also decline to accept Louisville's argument that a correctional officer may never, under any circumstances, use force against a restrained inmate. We agree with the unremarkable proposition that, as a general principle, physical force should not be used against an inmate who poses no danger. *See, e.g., Powell*

*v. Fugate*, 364 F. Supp. 3d 709, 724 (E.D. Ky. 2019) ("Needless to say, gratuitously punching, macing, and/or tasing a restrained inmate, as described by Powell, would violate the inmates clearly established constitutional rights."). But holding that *any* use of force against a restrained inmate would *always* be excessive and unreasonable takes that general proposition too far. First, there is some indication in Morton's testimony that at least one of the inmates was at least partially unrestrained. Second, even a restrained inmate may still pose dangers to officers and others by doing things like biting, kicking, spitting, and stomping.

In short, the propriety of force is dependent upon the facts. And only a trial, not summary judgment, may resolve disputed facts. Our conclusion is simple: if Morton used excessive force against inmates twice within fifteen days, Louisville had just cause to terminate him. But there are material, disputed facts preventing us, or the trial court, from concluding that Morton did so. Accordingly, Louisville has not shown with the unquestionable clarity necessary to support summary judgment that it would be impossible for Morton to prevail at trial.

For the foregoing reasons, the Jefferson Circuit Court is reversed, and the matter is remanded for further proceedings consistent with this opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Joshua T. Rose
Louisville, Kentucky

BRIEF FOR APPELLEE:

Michael J. O'Connell
Jefferson County Attorney
Louisville, Kentucky

J. Denis Ogburn
Assistant Jefferson County Attorney
Louisville, Kentucky