RENDERED:  DECEMBER 5, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2024-CA-1259-MR

TERRI BRADSHAW                                                      APPELLANT


|       | APPEAL FROM FRANKLIN CIRCUIT COURT |
|-------|-----------------------------------------|
| v.    | HONORABLE PHILLIP J. SHEPHERD, JUDGE    |
|       | ACTION NO. 24-CI-00151                  |


CAPITAL COMMUNITY ECONOMIC/
INDUSTRIAL DEVELOPMENT
AUTHORITY d/b/a KENTUCKY CAPITAL
DEVELOPMENT CORPORATION                                            APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  EASTON, A. JONES, AND LAMBERT, JUDGES.

JONES, A., JUDGE:  Terri Bradshaw appeals the Franklin Circuit Court's

summary dismissal of claims she asserted against the above-captioned appellee

("KCDC"), her former employer, for breach of contract and alleged violations of

Kentucky's Open Meetings Act and Whistleblower Act. Each of her claims are discussed in depth below. Upon review, we affirm.

**1. Breach of contract for failing to hire an executive assistant and offering an insufficient amount to compensate for vacation and comp time**

### a. Background

While the record in this matter is relatively small, the nature of Bradshaw's claims, how they were resolved below, and her appellate arguments relative to them are complex and require a thorough understanding of this case's procedural history. Bradshaw asserted four ostensible "breach of contract" claims against KCDC, but the first three of them (discussed here) were separate aspects of just one overarching claim. The relevant sections of her February 14, 2024 complaint were as follows:

> 9. On January 16, 2019, [Bradshaw] and KCDC signed an employment contract wherein [Bradshaw] would serve as KCDC's President and Chief Executive Officer for five (5) years starting on January 15, 2019[,] until January 15, 2024. **Exhibit 1** – Contract.
>
> 10. [Bradshaw] was to be paid $90,000.00 per year with the potential to "receive annual raises as determined by the board in accordance with performance evaluations, to be done annually."
>
> 11. [Bradshaw's] salary was raised to $100,000.00 in 2020. No additional raises extended during the Contract term.

12. [Bradshaw] was entitled to the same fringe benefits, "including holidays, vacations, and sick leave, as regular full-time employees of Franklin County."

13. Additionally, [Bradshaw] was to be supplied with "one (1) full-time executive assistant" at KCDC's expense.

. . .

## COUNT I – BREACH OF CONTRACT ("EXECUTIVE ASSISTANT")

. . .

76. Section 7 of the Contract required KCDC to supply [Bradshaw] with a full-time staff assistant at KCDC's cost.

77. KCDC breached Section 7 by failing and refusing to supply a full-time assistant.

78. Due to KCDC's breach, [Bradshaw] was required to work significant overtime to satisfy her duties under Section 6 of the Contract.

79. Specifically, during the five-year term, [Bradshaw] worked 3143.5 hours over and above her standard work hours that KCDC now claims she is not entitled under the Contract.

80. Therefore, as a direct and proximate result of KCDC's breach, [Bradshaw] has been damaged in the amount of $161,204.97 plus costs, pre-judgment interest, and post-judgment interest from the date of Judgment until satisfied in full.

## COUNT II – BREACH OF CONTRACT
### ("VACATION TIME")

81. [Bradshaw] reaffirms and reiterates the allegations contained in numerical paragraphs 1 through 80 above, the same as if set forth verbatim herein.

82. Per Section 5 of the Contract, [Bradshaw] is entitled to be paid for accumulated vacation time upon employment completion.

83. [Bradshaw]'s claim of accumulated vacation time totaled 1,189.5 hours.

84. KCDC claims [Bradshaw] is only entitled to 277.5 hours, thereby breaching the Contract.

85. Therefore, as a direct and proximate result of KCDC's breach, [Bradshaw] has been damaged in the amount of $60,997.56 plus costs, pre-judgment interest, and post-judgment interest from the date of Judgment until satisfied in full.

## COUNT III – BREACH OF CONTRACT
### ("COMP TIME")

86. [Bradshaw] reaffirms and reiterates the allegations contained in numerical paragraphs 1 through 85 above, the same as if set forth verbatim herein.

87. Per Section 5 of the Contract, [Bradshaw] is entitled to be paid for accumulated vacation time upon employment completion.

88. [Bradshaw's] claim of accumulated comp time totaled 3,143.5.

89. KCDC claims [Bradshaw] is only entitled to 50 hours, thereby breaching the Contract.

> 90. Therefore, as a direct and proximate result of KCDC's breach, [Bradshaw] has been damaged in the amount of $161,204.97 plus costs, pre-judgment interest, and post-judgment interest from the date of Judgment until satisfied in full.

In summary, Bradshaw asserted she needed to work 3,143.5 hours in excess of her regular salaried hours during her five-year contract because KCDC failed to hire an executive assistant for her; and that those excessive hours entitled her, in turn, to: (1) the cash equivalent of 1,189.5 hours of accumulated vacation time ($60,997.56);[1] and (2) the cash equivalent of 3,143.5 hours of accumulated comp time ($161,204.97). She further alleged KCDC was in breach of the five-year contract because it claimed, to the contrary, that she was only entitled to the cash equivalent of 277.5 hours of accumulated vacation time and the cash equivalent of 50 hours of accumulated comp time.

On March 7, 2024, rather than answering Bradshaw's complaint, KCDC moved to dismiss pursuant to CR[2] 12.02. In its motion, KCDC acknowledged its position was indeed that Bradshaw was only entitled to the cash equivalent of 277.5 hours of accumulated vacation time and the cash equivalent of 50 hours of accumulated comp time. KCDC also asserted that on February 20, 2024, at Bradshaw's direction, it had also issued a check to the Franklin County

---

[1] It is undisputed that Bradshaw's hourly rate of pay for vacation and comp hours was $51.28.

[2] Kentucky Rules of Civil Procedure.

-5-

Treasurer (to be deposited into Bradshaw's deferred compensation account) for what KCDC had calculated was the cash equivalent of those hours.

Further, KCDC contended that even if the facts of Bradshaw's complaint were taken as true, Bradshaw had failed to state legally cognizable claims for any amount beyond what it had paid the Franklin County Treasurer. First, "Section 7 of the Contract" did not simply require "KCDC to supply [Bradshaw] with a full-time staff assistant at KCDC's cost," as Bradshaw had alleged in Paragraph 76 of her complaint. The full text of that provision, as set forth in Bradshaw's employment contract (which Bradshaw had attached to her complaint as an exhibit) provided:

> 7. **Office and Staff**. Employee shall be supplied a furnished office and one (1) Full-Time Equal Executive Assistant at the cost of the Employer. *Employee shall recommend to the Employer the name of such Executive Assistant and terms and conditions of employment*; however, the said Executive Assistant and the terms and conditions of such employment shall be approved and accepted only by action of the Employer.

(Emphasis added.) As KCDC noted, Bradshaw's complaint did not allege Bradshaw had made any such recommendation.

Second, KCDC argued Bradshaw's contract did not entitle her to more than the cash equivalent of 277.5 hours of accumulated vacation time and the cash equivalent of 50 hours of accumulated comp time, irrespective of whether she was provided an executive assistant. As Bradshaw acknowledged in Paragraph 12

-6-

of her complaint, she was "entitled to the same fringe benefits, 'including holidays, vacations, and sick leave, as regular full-time employees of Franklin County.'"[3]  In turn, the personnel policy ordinances governing holidays, vacations, and sick leave of regular, salaried, "exempt," "policy-making," full-time, non-public-safety employees of Franklin County (like Bradshaw) specified that such employees were allowed – absent "recommendation by the department head and approval of the County Judge/Executive" – to *only accrue 50 hours of comp time in one fiscal year.*[4]  As KCDC noted, Bradshaw's complaint did not allege Bradshaw had secured a recommendation by the department head and approval of the County Judge/Executive to exempt her from that rule.

Those ordinances also specified that employees with 60 to 119 months of service (and Bradshaw's 5-year contract equated to 60 months of service) were

---

[3] Specifically, her employment contract provided:

> 5. **Fringe Benefits**.  Employee shall receive the same fringe benefits, including holidays, vacations and sick leave, as regular full-time employees of Franklin County; shall be included in the Kentucky Association of Counties (KACo) group health, dental and life insurance plans; shall be included under the KACo Workers' Compensation and Unemployment Insurance coverage; shall participate in the County's CERS retirement plan; and shall be eligible for membership in any Credit Union offered to County employees and shall be eligible for all other County benefits, all on the same terms and conditions as regular full-time County employees.

[4] *See Franklin Cnty. Ord.* § 30.051(B)(1), available at https://codelibrary.amlegal.com/codes/franklincoky/latest/franklinco_ky/0-0-0-550#JD_30.051 (last visited Oct. 28, 2025).

only entitled to carry forward a maximum of 277.5 hours of annual leave (*e.g.*, "vacation time") from one calendar year to the next.[5]  Accordingly, the face of Bradshaw's complaint demonstrated Bradshaw was, at most, entitled to be compensated for 50 hours of comp time and 277.5 hours of annual leave; and that KCDC therefore could not be in breach of contract for claiming Bradshaw was only entitled to be compensated for those amounts of hours.

In her written response to KCDC's motion, Bradshaw argued Kentucky's "notice pleading" standard excused her from alleging or otherwise indicating in her complaint that she had satisfied any condition precedent relevant to her breach of contract actions (*i.e.*, that she had either recommended the name of an executive assistant for KCDC to hire for her, or secured a recommendation by the department head and approval of the County Judge/Executive to exempt her from the 50-hour cap on her comp time).  She also argued it would be "inappropriate" for the circuit court to take judicial notice of the ordinances KCDC had cited in (and attached as exhibits to) its motion to dismiss.[6]  However, during oral arguments, Bradshaw's counsel acknowledged that the Franklin ordinances

---

[5] *Franklin Cnty. Ord.* § 30.077(B).

[6] Bradshaw has not reasserted this argument on appeal.  Moreover, ordinances are subject to judicial notice.  *See, e.g.*, *Polley v. Allen*, 132 S.W.3d 223, 226 (Ky. App. 2004) ("A court may properly take judicial notice of public records and government documents, including public records and government documents available from reliable sources on the internet.").

ultimately governed Bradshaw's entitlement to vacation and comp time; and that KCDC had tendered Bradshaw an amount it had calculated to be the cash equivalent of those hours.[7]

The circuit court ultimately adjudicated these claims consistently with KCDC's position, but it did so in two phases. In its July 31, 2024 order of dismissal – the first phase – the circuit court determined with respect to the "failure to hire an executive assistant" aspect that KCDC's "failure" could not give rise to a breach of contract absent any allegation that Bradshaw had proposed the hiring of a qualified applicant or that the Board had rejected her recommendation; and that in any case "it was not a fringe benefit personal to Bradshaw, but rather an employment policy designed to improve the efficiency of the corporation." Continuing in that vein, it explained:

> [I]f [Bradshaw] had notified the Board that she was claiming compensatory time for the additional work she allegedly did as a result of this position remaining vacant, perhaps the Board would have required her to hire an assistant they could afford, or to replace Bradshaw with another Executive Director who could do the required work without claiming over 3,000 hours of compensatory time.

July 31, 2024 order (Record at 146).

---

[7] *See* July 15, 2024 Hearing at 10:17:43 – 10:18:32.

With respect to the "failure to appropriately pay comp and vacation time" aspects, the circuit court noted that as part of her employment contract, Bradshaw was only to receive the same fringe benefits, including holidays, vacation and sick leave, as regular full-time employees of Franklin County – *irrespective* of KCDC's failure to hire an executive assistant for her. It noted Bradshaw provided no indication that she sought or received approval of the Board for any overtime hours, much less for the 3,143.5 overtime hours she had allegedly worked over the course of her five years of employment to compensate for the lack of an executive assistant.[8] It further explained that "Full-time regular employees of Franklin County who had the same months of service as Bradshaw were permitted to carry over 277.5 hours of vacation time from one year to the next."[9] Continuing in this vein, it held:

> [Bradshaw's] claims for vacation time and compensatory time in excess of amounts provided for by Franklin County government fail to state a claim upon which relief can be granted. Under the contract, she is explicitly limited to the vacation time and compensatory time provided for in the personnel policy applying [to] the Franklin County government. Defendants have conceded that Bradshaw is entitled to whatever fringe benefits she has earned as a regular, full-time employee of Franklin County. Defendants have represented to the court that they have tendered a check for the amount she is due. While the exact amount due may not be fully agreed

---

[8] Record at 129.

[9] Record at 133.

-10-

upon between the parties, there is no question that Franklin County government policy controls, and therefore [Bradshaw's] claims for compensation in excess of those amounts cannot be sustained.

Record at 132. In a footnote, the circuit court added: "If an actual controversy should arise about the amount Bradshaw is entitled to, the parties may bring that issue back before the Court."[10] It concluded by stating:

> **WHEREFORE**, for the reasons stated above, Defendant's Motion to Dismiss is **GRANTED**. This matter is **DISMISSED** for failure to state a claim upon which relief can be granted. The issues related to vacation time and comp time may be brought back before the Court should the parties be unable to reach a conclusion between themselves. This is a final and appealable order and there is no just cause for delay.

Record at 146.

Based on what is set forth above and the circuit court's use of the CR 54.02(1) finality language in the concluding sentence of its order, the circuit court: (1) dismissed the *part* of Bradshaw's three ostensible breach of contract claims discussed herein to the extent they sought compensation beyond the monetary equivalent of 277.5 hours of vacation time and 50 hours of comp time; and (2) reserved jurisdiction to resolve whether KCDC had, as it claimed, tendered Bradshaw an amount sufficient to satisfy that monetary equivalent.

---

[10] Record at 133 n.1.

The second phase of how the circuit court adjudicated these claims then began with KCDC's August 7, 2024 "notice of filing of proof of payment." Taken objectively, this was a motion for summary judgment regarding what remained. KCDC's filing included: (1) a copy of a negotiated February 20, 2024 check from KCDC, payable to "Treasurer, Franklin County," in the amount of $14,502.39 and bearing a check number of 7628; (2) a spreadsheet detailing KCDC's calculations of that amount, which were based upon gross pay of $16,794 (277.5 vacation hours plus 50 comp hours multiplied by Bradshaw's hourly salary rate of $51.28), minus deductions for FICA, Medicare tax, local tax, and Kentucky Employees Retirement Systems; (3) a bank record indicating check number 7628 had been negotiated and paid on February 28, 2024; and (4) a copy of an August 6, 2024 letter KCDC's attorney purportedly sent to Bradshaw's counsel that explained its calculations, and noted that the check had been made payable to the Franklin County Treasurer at Bradshaw's request so that the funds could be rolled into her retirement account, and that the check had been negotiated on February 28, 2024. The letter ended by stating:

> Given the court's July 31, 2024, Opinion and Order, I believe this should conclude all matters and shows KCDC fully satisfied its salary and benefits obligations to Bradshaw. We intend to file a copy of this information in the Court record to address any question left open by the Court's Opinion about this topic.

Also on August 7, 2024, Bradshaw filed a CR 59.05 motion for the circuit court to alter, amend, or vacate its July 31, 2024 order. There, she asserted – incorrectly – that the circuit court had not reserved jurisdiction to resolve whether KCDC had, as it claimed, tendered Bradshaw an amount sufficient to satisfy that monetary equivalent. She also faulted the circuit court for providing her what she believed had been inadequate time to conduct discovery before dismissing her claims. However, Bradshaw did not explain what additional discovery she wished to seek. Lastly, she took issue with the fact that the circuit court had styled its July 31, 2024 order as a summary judgment order, rather than as a dismissal pursuant to CR 12.02.

In its August 9, 2024 response, KCDC urged the circuit court to (1) deny Bradshaw's CR 59.05 motion and (2) dismiss what remained of these claims. To that latter point, it reiterated the substance of its "notice of filing of proof of payment" and argued, "Bradshaw has been paid all of the compensatory 'overtime' to which she is entitled, and so she cannot show that she has been damaged by any alleged breach of contract with regard to the hiring of an assistant. No amount of discovery will change the content of the contract or the Ordinances."

On September 3, 2024, Bradshaw filed a reply memorandum. There, she provided more clarity regarding the additional discovery she wished to seek, which (relevant to these claims) was information regarding: (1) "the factual

-13-

circumstances related to Ms. Bradshaw's claim that KCDC failed to provide her with an executive assistant as promised and that she had to work significant overtime to compensate for the lack of assistance";[11] and (2) "what she has been paid and what she was entitled to be paid" regarding her "accumulated vacation time and comp time[.]"[12]

But, Bradshaw did not controvert or address any of the evidence KCDC had put forth regarding the $14,502.39 payment it had made to the Franklin County Treasurer at her direction. Instead, she asserted "the non-moving party does not have the burden of proof to overcome a motion for summary judgment," that she was entitled to "ample opportunity to complete discovery,"[13] and that

> KCDC asserts that there is nothing further to adjudicate regarding Ms. Bradshaw's claim that she has not been fully paid for her vacation time and comp time because KCDC has tendered to her a check for what it believes she is owed, and that check has been negotiated. However, KCDC's belief the issue has been resolved does not make it resolved. Ms. Bradshaw does not believe the issue has been resolved and claims she has not been paid in full for her accumulated time.[14]

---

[11] Record at 184.

[12] Record at 185.

[13] Record at 187.

[14] Record at 188.

On September 26, 2024, the circuit court then entered its order resolving what remained of this litigation. As it pertained to these breach of contract claims, the circuit court held in relevant part:

> Since Bradshaw was tendered payment for the amount of vacation and comp time allowed under the personnel policy, the issue is moot. There are no disputes of material fact surrounding the issue. The record is clear on both the facts that Bradshaw's employment contract incorporated the policies of the Franklin County Ordinances, and that said policies capped vacation and compensatory time. The clarity of these policies is uncontested and, combined with Bradshaw's failure to contest the application of these policies, the fact that KCDC tendered the amount owed to Bradshaw pursuant to the policies leaves no room for further remedy on the issue. She obtained all the relief to which she could possibly be entitled when the KCDC tendered her a check for the full amount she was due under her contract. Therefore, Bradshaw has failed to state a claim upon which relief may be granted. This decision was based on allegations made in the complaint, undisputed contract terms, and the Franklin County Ordinance which was properly subject to judicial notice. Thus, there was no manifest error of law or fact central to the decision of the Court. Further, there is no need for the Court to retain jurisdiction on this matter.

**b. Standard of review**

As discussed, the circuit court ultimately treated KCDC's CR 12.02 motion to dismiss Bradshaw's claims as a motion for summary judgment. Accordingly,

> "The standard of review on appeal of a summary judgment is whether the trial

court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Coomer v. CSX Transp. Inc.*, 319 S.W.3d 366, 370 (Ky. 2010). We review a trial court's summary judgment ruling de novo. *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010). We must also view the record in a light most favorable to the nonmoving party and resolve all reasonable doubts in that party's favor. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991).

*Peterson v. Foley*, 559 S.W.3d 346, 348 (Ky. 2018). Moreover, the party opposing summary judgment, "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Steelvest*, 807 S.W.2d at 481 (internal quotation [marks] and citations omitted).

*Eagle Furniture Manufacturers, LLC v. Nautilus Ins. Co.*, 706 S.W.3d 780, 783 (Ky. App. 2025). This appeal also involves review of the circuit court's legal constructions of contracts, statutes, and ordinances, which we review *de novo*.

**c. Analysis**

Bradshaw offers four arguments on appeal regarding why, in her view, the circuit court erred in dismissing her breach of contract claims discussed above. First, Bradshaw contends that for purposes of opposing KCDC's motion to dismiss her breach of contract claims, she had no obligation to plead or adduce evidence supporting that she fulfilled any conditions precedent. Alternatively, she

-16-

argues that her allegation in Paragraph 77 of her complaint effectively pled that she satisfied the "condition precedent" regarding her obligation, per Section 7 of her employment contract, to recommend the name of an executive assistant and terms and conditions of employment to KCDC. She argues the circuit court erred to the extent it held otherwise.

We disagree. In breach of contract actions, whether a condition precedent set forth in a contract has been satisfied is part of what a plaintiff must prove. *See, e.g.*, *Kuntz v. Peters*, 286 Ky. 227, 150 S.W.2d 665, 667 (1941) ("[A] party seeking to enforce specific performance usually has the burden of proving that he has complied with its terms, or that he is ready, able, and willing to perform his obligations under the contract, in their entirety, and to do whatever has been made a *condition precedent* on his part.") (emphasis added) (citation omitted). It is also part of what a plaintiff must generally plead. *See* CR 9.04. Here, Bradshaw did not plead that she satisfied any conditions precedent inhering in her contract with KCDC. Nor, even after KCDC pointed out that shortcoming in its motion to dismiss, did she seek to amend her complaint to aver generally that all conditions precedent had been performed or had occurred. *Id.* Bradshaw also did not attempt to adduce any evidence that she had satisfied the conditions precedent. By failing to plead or adduce evidence supporting that she fulfilled these conditions precedent inhering in her contract, Bradshaw proceeded at her own peril.

-17-

As for the latter part of Bradshaw's argument, even if Paragraph 77 of her complaint did effectively plead that she satisfied the "condition precedent" regarding her obligation to recommend the name of an executive assistant and terms and conditions of employment to KCDC, the point is irrelevant: KCDC's failure to hire Bradshaw an executive assistant had no bearing upon the amount of vacation time and comp time Bradshaw was entitled to accrue, and those were the only measures of damages Bradshaw asserted with respect to these three breach of contract claims.

> For her second argument, Bradshaw contends:
>
> In its motion to dismiss, KCDC alleged that the maximum amount of unpaid vacation and comp time Bradshaw could accumulate under the county employee leave ordinance, based upon her length of employment, was 277.5 hours vacation time and 50 hours comp time. *Although there is no evidence in the record as to how long Bradshaw was employed with KCDC, or with the county before KCDC*, the court concluded that KCDC's allegation as to Bradshaw's maximum accumulated vacation and comp time to be true. ([Record] R. at 132-133.) This holding was in error under the summary judgment standard. Viewing the record in a light most favorable to Bradshaw, and resolving all doubts in her favor, it is not impossible for Bradshaw to produce evidence at trial warranting a judgment in her favor as to the vacation and comp time claims.

Bradshaw Br. at 11-12 (emphasis added).

Our response to this argument is threefold. First, the length of Bradshaw's term of service had no bearing upon her ability to accumulate comp

time, which was capped at 50 hours per year regardless. *See Franklin Cnty. Ord.* §
30.051(B)(1). Thus, it *would* be impossible for Bradshaw to produce evidence at
trial warranting a judgment in her favor as to her claim for the monetary equivalent
of 3,143.5 hours of comp time.

Second, even if Bradshaw worked more than five years for KCDC
and/or Franklin County, she would not have been entitled to carry over *more* than
277.5 hours of vacation time per year unless she had accrued a minimum of 120
months (*e.g.*, 10 years) of service – in which case she could have carried over
337.5 hours. The *most* vacation time she could have carried over would have been
450 hours – and only if she had accrued a minimum of 240 months (*e.g.*, 20 years)
of service. *See Franklin Cnty. Ord.* § 30.077(B). Thus, even if Bradshaw had
worked more than five years for KCDC or Franklin County, it *would* be impossible
for Bradshaw to produce evidence at trial warranting a judgment in her favor as to
her claim for the monetary equivalent of 1,189.5 hours of vacation time.

Lastly, there *is* "evidence in the record as to how long Bradshaw was
employed with KCDC." That evidence was her employment contract – the only
contract that was at issue and allegedly breached in this matter. Her employment
contract specified an employment period of *five years* from January 15, 2019,
through January 15, 2024. If Bradshaw was employed with KCDC or the county
longer than that, she made no such allegation in her complaint; she made no such

-19-

insinuation in any of her other filings of record below; she has never indicated how much longer than five years she might have worked for KCDC or Franklin County; and most importantly, she did not bring this point to the circuit court's attention after it entered either of its judgments – both of which relied upon the five-year term set forth in Bradshaw's employment contract. "The appellate court reviews for errors, and a nonruling is not reviewable when the issue has not been presented to the trial court for decision." *Turner v. Commonwealth*, 460 S.W.2d 345, 346 (Ky. 1970).

> For her third argument, Bradshaw contends:
>
> The court's error as to the vacation and comp time claims went further. The judgment acknowledged that KCDC admitted in its motion to dismiss that it still owed Bradshaw for 277.5 hours of vacation time and 50 hours of comp time, and the judgment held that the exact amount owed was undetermined and unpaid. Nevertheless, the judgment dismissed these claims in their entirety. (R. at 133). It was error for the court to hold that Bradshaw was owed money for unpaid vacation and comp time as she claimed, but then dismiss such claims.

Bradshaw Br. at 12.

The problem with Bradshaw's argument is that it ignores the events that transpired *after* the circuit court entered its July 31, 2024 order (*e.g.*, after "R. at 133"). To review, KCDC effectively moved for summary judgment days later regarding the exact amount owed that was undetermined and unpaid to Bradshaw.

-20-

Bradshaw responded by asserting she *believed* KCDC's evidence did not resolve the issue, that she had no obligation to respond to KCDC's evidence, and that she was entitled to more time for discovery. Afterward, the circuit court summarily dismissed this aspect of Bradshaw's claim, determining in its September 26, 2024 order that Bradshaw "obtained all the relief to which she could possibly be entitled when the KCDC tendered her a check for the full amount she was due under her contract," and that "[t]here are no disputes of material fact surrounding the issue."

KCDC submitted a properly supported motion for summary judgment regarding the exact amount owed that was undetermined and unpaid to Bradshaw. Contrary to what she surmised below, Bradshaw was then obligated "to come forward with some evidence casting doubt on the validity of" what KCDC presented. *Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 200 (Ky. 2010). "[A] party opposing a properly supported summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* (citation omitted). Bradshaw failed to fulfill her obligation. Her unsupported *belief* that an issue remained unresolved in this regard was insufficient to oppose KCDC's motion because "'[b]elief' is not evidence and does not create an issue of material fact." *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 124 (Ky. App. 2012) (citations omitted).

Additionally, Bradshaw had no entitlement to additional discovery – only a reasonable opportunity to conduct discovery – which also leads to Bradshaw's fourth argument regarding this set of claims. Bradshaw takes issue with the fact that the circuit court did not indicate it would treat part or all of KCDC's CR 12.02 motion as a summary judgment motion until the circuit court expressed that sentiment in its July 31, 2024 order. She asserts the circuit court accordingly abused its discretion by not providing her more of an opportunity to conduct discovery regarding certain issues relating to these claims.

We disagree. To be clear,

> [S]ummary judgment is not dependent upon discovery schedules. [KCDC was] entitled to move for summary judgment "at any time." Kentucky Rule of Civil Procedure ("CR") 56.02. And, so long as a party responding to such a motion has had an adequate opportunity to conduct discovery beforehand, the circuit court does not abuse its discretion in granting such a motion. *See Hartford Ins. Group v. Citizens Fidelity Bank Trust Co.*, 579 S.W.2d 628, 630 (Ky. App. 1979); *see also Blankenship*, 302 S.W.3d at 668 ("The trial court's determination that a sufficient amount of time has passed and that it can properly take up the summary judgment motion for a ruling is reviewed for an abuse of discretion.").

> To request additional time for discovery in response to a summary judgment motion, a party would need to provide an affidavit under CR 56.06 alleging genuine issues pertaining to material facts, or request "a continuance to obtain affidavits pursuant to CR 56.06." *Hartford Ins. Group*, 579 S.W.2d at 630-31.

-22-

*Nautilus Ins. Co.*, 706 S.W.3d at 788.

As discussed, in her September 3, 2024 reply memorandum, Bradshaw indicated she wished to conduct more discovery regarding (1) "the factual circumstances related to Ms. Bradshaw's claim that KCDC failed to provide her with an executive assistant as promised and that she had to work significant overtime to compensate for the lack of assistance"; and (2) "what she has been paid and what she was entitled to be paid" regarding her "accumulated vacation time and comp time[.]" Bradshaw also argues on appeal that she should have been permitted more time to discover (3) how long she was employed with KCDC, or with the county before KCDC.

As we have explained at length, however, the first of those issues was irrelevant. The second was an issue of basic math. The third should have been known to Bradshaw at all relevant times. And with respect to each of those issues, Bradshaw provided no CR 56.06 affidavit alleging genuine issues pertaining to material facts or requesting a continuance to obtain affidavits. Moreover, there were more than seven months between the date Bradshaw filed her complaint and the date the circuit court ultimately disposed of this litigation. In *Hartford*, 579 S.W.2d 628, this Court deemed *six* months between the filing of the complaint and the entry of summary judgment to be a sufficient opportunity to either engage in discovery or inform the trial court why a ruling on summary judgment ought to be

-23-

continued pursuant to CR 56.06. Thus, we do not conclude that the circuit court prematurely entered summary judgment regarding these claims. In summary, Bradshaw has identified no reversible error with respect to the circuit court's decision to dismiss these first three of her four breach of contract claims.

## 2. "Breach of Contract: Termination of Contract in Violation of Open Meetings Law"

The heading of this section of our analysis (which we have borrowed from Bradshaw's brief) is a misnomer because this, Bradshaw's fourth and final breach of contract claim, is mashed up with yet another of her claims – one asserting violations of Kentucky's Open Meetings Act, KRS[15] 61.805 *et seq.* ("OMA"). For the sake of brevity, we will address both of those claims here. The provision of Bradshaw's employment contract with KCDC relevant to these claims was as follows:

> 10. **Renewal/Non-Renewal**. This contract may be renewed as the parties hereto agree. Notice of Employer's intent to not renew this contract shall be furnished in writing to Employee three (3) months prior to the expiration date herein contained. This agreement will automatically renew at the end of each term of five years for a further term of five years unless otherwise notified three months prior to expiration date.

Bradshaw's fourth breach of contract claim may be summarized as follows. KCDC undisputedly gave Bradshaw actual written notice on October 12,

---

[15] Kentucky Revised Statute.

2024 – more than three months before the expiration date of her employment contract – that it intended not to renew her contract. But, Bradshaw believes KCDC's notice to her of its intention not to renew her contract was void *ab initio* because KCDC made its decision to give her that notice during an October 6, 2023 meeting where, according to Bradshaw, KCDC committed five violations of the OMA. Therefore, Bradshaw reasons, when her employment with KCDC ended on January 15, 2024 (*e.g.*, when the five-year term of her employment contract expired), her employment did not end pursuant to Paragraph 10 of the contract, and KCDC breached its contract by refusing to allow her to continue her employment.

Bradshaw further alleged that these five purported OMA "violations," apart from automatically negating KCDC's otherwise timely nonrenewal notice, also entitled her to an award of $500 ($100 for each violation) and attorney's fees pursuant to KRS 61.848(6). The December 21, 2023 OMA complaint Bradshaw tendered to KCDC, which Bradshaw included as an exhibit to her complaint before the circuit court, detailed those violations as follows:

> On October 6, 2023, a "special" KCDC meeting was held at the Fiscal Court building to discuss during closed session the "appointment, discipline, or dismissal of an individual employee, member, or student without restricting that employee's, member's, or student's right to a public hearing if requested" per KRS 61.810(1)(f). **Exhibit 1** – October 6, 2023 Agenda. No other details were provided. The closed session, or special meeting, was never raised during an earlier regular meeting.

Before the meeting, the agenda was not placed conspicuously within the Fiscal Court building. Once the meeting started and KCDC entered closed session, the board discussed and took final action not to renew Ms. Bradshaw's Contract for an additional five years. **Exhibit 2** – Contract. After emerging from closed session, the board immediately voted not to renew the Contract. Six days later on October 12, 2023, . . . KCDC's former attorney, tendered your notice not to renew per Paragraph 10. **Exhibit 3** – Notice Letter.

KCDC violated numerous open meetings laws relating to the special meeting and closed session. First, KCDC did not conspicuously post the meeting agenda within the Fiscal Court before the meeting, in violation of KRS 61.823(4)(c). Second, KCDC did not announce the special meeting and closed session during an earlier regular meeting, violating KRS 61.815(1)(a). Third, the closed meeting description simply reciting KRS 61.815(1)(f) is insufficient notice of the topics to be discussed during closed session, violating KRS 61.815(1)(a). Fourth, discussing Ms. Bradshaw's contract renewal does not fall within the closed session exception for "appointment, discipline, or dismissal" of an individual employee, violating KRS 61.810(1)(f). Fifth, KCDC took final action, as defined by KRS 81.805(3) [sic] and KRS 61.815(1)(c), during the closed session by agreeing not to renew the contract then immediately voting thereafter in open session, in violation of KRS 61.815(1).

The circuit court dismissed Bradshaw's fourth breach of contract claim and her OMA claims as a matter of law. Bradshaw argues the circuit court erred in doing so, but we agree with its disposition. The basic misapprehension of Bradshaw's breach of contract claim is its assertion that violations of the OMA render official actions void *ab initio*. They do not. Under KRS 61.848(5), a court

-26-

of appropriate jurisdiction has authority to remedy a situation where a public agency takes formal action without substantial compliance with the requirements of KRS 61.810, 61.815, 61.820, and 61.823.  One *possible* remedy[16] is that any such action "shall be *voidable* by a court of competent jurisdiction."  KRS 61.848(5) (emphasis added).  "A 'voidable' action is an action that is valid until it is annulled."  *Carter v. Smith*, 366 S.W.3d 414, 424 (Ky. 2012) (citing BLACK'S LAW DICTIONARY 1709 (9th ed. 2009)).

Whether such formal action *should* be voided is the plaintiff's burden to prove through a showing of prejudice and equity.[17]  Further, a simple OMA violation is insufficient to trigger the statutory sanctions of KRS 61.848(6).  The agency's actions must be "willful"; and even then, the provision still leaves the

---

[16] That formal action is voidable "does not limit the court from granting other appropriate relief" under the OMA.  *See Jefferson County Bd. of Ed. v. Courier-Journal*, 551 S.W.2d 25, 29 (Ky. App. 1977).

[17] *See, e.g.*, *Lincoln Trail Grain Growers Association, Inc. v. Meade Cnty. Fiscal Court*, 632 S.W.3d 766, 773 (Ky. App. 2021) (explaining plaintiffs asserting OMA violations "bear the burden of proof on these claims as well as the appropriate remedies"); *id*. at 775 ("[I]t is for the trial court to determine the appropriate remedies available . . . and the equities among the various parties."); *Chandler v. Bullitt Cnty. Joint Planning Comm'n*, 125 S.W.3d 851, 856 (Ky. App. 2002) ("Since there was no showing of prejudice by the Commission's violation . . .  The trial court was well within its discretion in refusing to void the Commission's action."); *Stinson v. State Bd. of Accountancy*, 625 S.W.2d 589, 592 (Ky. App. 1981) ("[S]ince [the OMA] renders an action taken without substantial compliance with KRS 61.815, not void but voidable, we do not choose to void the action of the Board because Stinson raised no objection and because he demonstrated no prejudice as a result of the Board's action.").

imposition of fees, costs, and/or penalties to the court's discretion. *See id.* ("Any person who prevails . . . may be awarded costs[.]").

In dismissing these claims, the circuit court held that the allegations of Bradshaw's complaint and evidence of record, taken in the light most favorable to Bradshaw, either did not demonstrate KCDC failed to substantially comply with the OMA, did not demonstrate Bradshaw suffered prejudice, or did not demonstrate a willful violation of the OMA occurred.[18]  With that in mind, we will address (in reverse order) what Bradshaw alleges were KCDC's OMA violations, beginning with her assertion that "KCDC took final action, as defined by KRS 81.805(3) [sic] and KRS 61.815(1)(c), during the closed session by agreeing not to renew the contract *then immediately voting thereafter* in open session, in violation of KRS 61.815(1)."

Taken objectively, Bradshaw is faulting KCDC's Board for taking what she believes were two "final actions" regarding her employment contract during the October 6, 2023 special meeting:  (1) a vote during the closed session for the purpose of reaching a general consensus among its members regarding whether to renew her employment contract; and (2) a subsequent vote during the

---

[18] The circuit court alternatively concluded – with little explanation – that KCDC's Board was not required to reach a voting consensus during an open meeting to decide not to renew Bradshaw's contract.  Considering our disposition of this matter, it is unnecessary to address that point.

open session for the purpose of finalizing its consensus.  Bradshaw believes the first of those votes was unauthorized by the OMA.

We disagree.  Assuming such a preliminary vote occurred during the closed session, we are persuaded by the Kentucky Attorney General's stance on this issue:  "[a] straw vote . . . for the purpose of reaching a general consensus among the members [of a public agency] does not constitute a violation of the Open Meetings Act as long as final action is taken in open session and the vote of each member, or his abstention, [is] recorded in the minutes."  *In re:  Kentucky Leader-News/Muhlenberg County Board of Education*, Ky. OAG[19] 17-OMD-124, 2017 WL 2869973, at *1 (Jun. 30, 2017).[20]  Here, KCDC filed the minutes of the October 6, 2023 meeting into the record as "Exhibit 5" to its motion to dismiss.  Bradshaw has never contested the veracity of the minutes.  The minutes provided in relevant part:

> Mr. Hulette moved that the [Board of Directors] go into closed session per KRS 61.810(1)(f) to discuss appointment, discipline, or dismissal of an individual employee, member, or student without restricting that employee's, members [sic], or student's right to a public hearing if requested.  Mr. Cecil seconded the motion and the motion was approved.  It was noted that a vote may be taken following the closed session.

---

[19] Opinion of the Attorney General.

[20] "While we are not bound by opinions of the Attorney General; this court can, however, afford them great weight."  *Louisville Metro Dep't of Corrections v. King*, 258 S.W.3d 419, 421-22 (Ky. App. 2007) (citation omitted).

CLOSED SESSION/OPEN SESSION

> The Chair noted that Mr. Hulette made a motion to return to open session and Mr. Rosen had seconded the motion.
>
> Mr. Cecil made a motion to comply with paragraph 10 of the employment contract dated January 16, 2019 between the KCDC and Terri Bradshaw, the President/CEO of KCDC, to provide notice of non-renewal of the contract, and direct the acting Chairperson to sign the written notice on behalf of KCDC Board of Directors. The motion was seconded by Rich Rosen. There was no discussion. All approved. The motion passed.

As recorded in the minutes, the Board took final action and each of its members voted regarding Bradshaw's employment contract in open session. No substantial violation of the OMA occurred in this respect.

Next, Bradshaw asserts that "discussing Ms. Bradshaw's contract renewal does not fall within the closed session exception for 'appointment, discipline, or dismissal' of an individual employee, violating KRS 61.810(1)(f)." In support, she cites *Carter*, 366 S.W.3d 414.

We disagree. In *Carter*, the Kentucky Supreme Court explained that KRS 61.810(1)(f) does not permit public agencies to discuss in closed session an employee's voluntary resignation and subsequent reemployment as an independent contractor. *Id*. at 421. This is so because a voluntary resignation is not a "dismissal" contemplated by the statute. *Id*. And, although the individual in question would have been "appointed" to perform work on behalf of the public

-30-

agency, the individual was being appointed as an independent contractor – not as an employee. For those reasons, the exception did not apply in that matter. *Id*. at 422.

Here, the Board discussed in closed session whether to renew Bradshaw's contract to work as its *employee*, not as its independent contractor. Furthermore, KRS 61.810(1)(f) logically applied to the Board's decision to renew or non-renew Bradshaw's contract. A decision to non-renew could be considered a "dismissal," depending on the terms of that employee's contract. *See, e.g.*, *Gibson v. Bd. of Educ. of Jackson Cnty.*, 805 S.W.2d 673 (Ky. App. 1991) (the failure to renew a teaching contract operated to dismiss the teacher without due process). Here, as a practical matter, a "dismissal" occurred: Bradshaw's employment with KCDC would have automatically continued for another five-year term, but it did not because the Board took affirmative action, pursuant to Paragraph 10 of her employment contract, to stop that from happening.

Conversely, if the Board had decided to renew her contract, its decision to do so would have qualified as an "appointment." Specifically,

> The word "appoint" means "to choose or designate (someone) for a position or job, especially in government." BLACK'S LAW DICTIONARY (11th ed. 2019). So long as "someone" has been chosen or designated to fill the position, that person has been "appointed.". . . KRS 61.810(1)(f) plainly applies in any instance in which the discussions may lead to the

"appointment" of an employee, regardless of whether that employee had been previously appointed.

*In re: Larry Richards/Fish and Wildlife Commission*, Ky. OAG 21-OMD-091, 2021 WL 2181999, at \*2 (May 17, 2021).

Next, Bradshaw argues "the closed meeting description simply reciting KRS 61.815(1)(f) is insufficient notice of the topics to be discussed during closed session, violating KRS 61.815(1)(a)." In this vein, she takes specific issue with two instances where the Board described the topic to be discussed during the closed session of its October 6, 2023 special meeting: first, the Board's description of that topic during the open session of its meeting as set forth in the minutes; second, the Board's roughly identical description of that topic as it was set forth in the agenda included with the written notice provided of its special meeting.[21] As for why Bradshaw believes those closed meeting descriptions did not substantially comply with the OMA, the only explanation she provides is: "The notice does not state there would be discussion about the renewal of *Bradshaw's* contract or why closed session was necessary."[22] (Emphasis added.)

We will start with how the Board described the topic of its closed session during the open session of its October 6, 2023 special meeting. With

---

[21] Bradshaw included the Board's notice as an exhibit to her complaint.

[22] Bradshaw Br. at 17.

reference to the formalities that must be observed during open session prior to conducting a closed session, KRS 61.815(1)(a) provides:

> Notice shall be given in regular open meeting of the general nature of the business to be discussed in closed session, the reason for the closed session, and the specific provision of KRS 61.810 authorizing the closed session[.]

Our Supreme Court has explained that KRS 61.815 requires a public body to "state the specific exception contained in the statute which is relied upon in order to permit a secret session. There must be specific and complete notification in the open meeting of any and all topics which are to be discussed during the closed meeting." *Floyd County Bd. of Educ. v. Ratliff*, 955 S.W.2d 921 (Ky. 1997). Based upon *Ratliff*, and with respect to KRS 61.810(1)(f), the Kentucky Attorney General has opined:

> Merely parroting the language of the provision, as the Board did here, does not satisfy the standard of "specific and complete notification" nor does it constitute a "sufficiently specific" description of the business at hand. . . . "[A] notification which does not include a statement of the specific exception relied upon to conduct a closed session, a description of the general nature of the business to be discussed [appointment, discipline, or dismissal of an individual employee] in, and the reason(s) for, the closed session [*which* of these particular actions is contemplated] is inadequate.

*In re: Sandra Lee Clevenger/Spencer County Board of Education*, Ky. OAG 08-OMD-165, 2008 WL 3865857, at *4 (Aug. 11, 2008) (emphasis added).

Recall, according to the minutes of its October 6, 2023 meeting, the Board justified its need for a closed session by stating it was necessary "per KRS 61.810(1)(f) to discuss appointment, discipline, or dismissal of an individual employee, member, or student without restricting that employee's, members [sic], or student's right to a public hearing if requested." The Board's justification was arguably inadequate because, while it cited the specifically applicable exception and indicated the general nature of the business to be discussed (by quoting the exception's full text), it did not specify *which* of the particular actions contemplated by the exception's full text would be discussed.

That said, Bradshaw does not argue or explain how this amounts to willful or prejudicial misconduct, as opposed to merely a technical violation of the OMA. We also disagree with Bradshaw's argument that the Board should have rectified this arguable shortcoming by indicating there would be discussion about the renewal of *her* contract. While "the public is entitled to know the general nature of the discussion which would be that it involves either a possible appointment, a possible dismissal, or a possible disciplinary matter relative to a specific unnamed person or persons[,]" "the public need not be advised as to the name of the specific person being discussed in connection with a possible appointment, dismissal, or disciplinary action[.]" *In re: Todd County*

*Standard/Todd County Board of Education*, Ky. OAG 06-OMD-150, 2006 WL

2309002, at \*5 (Aug. 1, 2006).

As for how the Board described the topic of its closed session in the

*agenda* of its October 6, 2023 special meeting notice, *less* was required of its

notice.  The operative statutory provision, KRS 61.823(3) provides that with

respect to special or emergency meetings:

> The public agency shall provide written notice of the
> special meeting.  The notice shall consist of the date,
> time, and place of the special meeting and the agenda.
> Discussions and action at the meeting shall be limited to
> items listed on the agenda in the notice.

The word "agenda" is not defined in the OMA, but the Attorney

General has aptly defined it in this context:

> In construing this provision, the Attorney General
> has recognized that although "[t]here is no definition of
> the term 'agenda' and no explanation as to what
> constitutes a satisfactory agenda" in the Act, "'agenda' is
> defined in part in Webster's Third New International
> Dictionary (1966) as 'a list or outline of things to be
> done, subjects to be discussed, or business to be
> transacted.'"  97-OMD-43, p. 3.  This definition, in our
> view, contemplates sufficient specificity in the
> description of the items to be discussed to insure fair
> notice to the public.  Fair notice cannot be imputed from
> vaguely worded descriptions of agenda items such as
> "old business," "new business," "open to floor," and
> "open to council."  Further, such vaguely worded
> descriptions invite discussions and actions on any topic
> without the limitations envisioned by the statute in a
> special meeting.

01-OMD-175, p. 5. We therefore concluded that "the practice of including open-ended agenda items like old and new business, or open to counsel and floor, is inconsistent with the natural and harmonious reading of KRS 61.823(3), as well as the statement of legislative policy codified at KRS 61.800, and the goal of maximizing notice to the public." *Id*. at 6, 7.

Applying these principles to an appeal in which an agenda item reading "Board and Presidential Leadership ad hoc Committee report" was challenged on the basis that it was not "sufficiently specific to insure fair notice to the public that a vote on extension of the President's contract would be conducted," in 02-OMD-22 we held:

> While we believe that the [agency] might have employed more specific language in describing the contemplated action, namely the vote on extending the President's contract, in the meeting agenda, we are not prepared to say that the agenda item was so vaguely worded that fair notice could not be imputed to the public. Certainly, it cannot be equated with such vague descriptions as "old business," and "new business."

*In re: Kim Chasteen / Foley Middle School Site Based Decision Making Council*, Ky. OAG 03-OMD-149, 2003 WL 21518703, at *3-4 (Jul. 1, 2003).

The topic listed in the agenda of the special meeting at issue in 03-OMD-149 was "Policy & Bylaws." *Id*. at *1. Rejecting that this language was inadequate for purposes of KRS 61.823(3), the Attorney General explained: "Because the item under discussion was the student dress code policy and bylaws, we are unpersuaded that distributing a proposed revision to the dress code policy,

to be discussed at the next Council meeting, exceeded the scope of discussion of that item, or that fair notice to the public could not have been imputed." *Id*. at *5.

The Attorney General also came to a similar conclusion with respect to language on an agenda indicating a public body would go into closed session to discuss "a personnel matter on a specific person." *In re: Furman F. Wallace/Hurstbourne City Commission*, Ky. OAG 04-OMD-199, 2004 WL 2515851, at *1 (Oct. 26, 2004). There, the Attorney General rejected the argument that the public body was required in its agenda "to observe the formalities for going into closed session 'by announcing in open session, that pursuant to KRS 61.810(1)(f) it is going into closed session to discuss either the appointment, or the discipline, or the dismissal of a employee of the agency, indicating which of these particular actions is contemplated.'" *Id*. It explained – and we agree – that argument (which Bradshaw is essentially raising here) constitutes an improper attempt to "superimpose the requirements for going into closed session found at KRS 61.815 on the requirements for notice of special meetings found at KRS 61.823(3)." *Id*. at *4.

If it is fair notice for purposes of KRS 61.823(3) and KRS 61.810(1)(f) for an agenda set forth in a special meeting notice to merely state that a public body would go into closed session to discuss "a personnel matter on a

specific person" – and we believe it is – then the KCDC Board certainly cannot be faulted for stating in its agenda, as it did here,

> CLOSED SESSION per KRS 61.810(1)(f) to discuss appointment, discipline, or dismissal of an individual employee, member, or student without restricting that employee's, members [sic], or student's right to a public hearing if requested. A vote may be taken following the closed session.

Next, Bradshaw argues "KCDC did not announce the special meeting and closed session during an *earlier* regular meeting, violating KRS 61.815(1)(a)." (Emphasis added.) In other words, Bradshaw believes a public body cannot hold a closed session in an emergency or special meeting unless, during an earlier, regularly scheduled meeting, the public body: (1) *predicted* that emergency or special circumstances would arise in the future and necessitate an emergency or special meeting prior to its next regularly scheduled meeting; and (2) specifically stated – during that earlier, regularly scheduled meeting – that it would go into closed session during that emergency or special meeting.

We disagree. It is enough to say that public bodies cannot be expected – and are certainly not required – to *predict* when *emergency* or *special circumstances* will arise in the future. They are only required to provide the public at least 24 hours' notice if they schedule an emergency or special meeting to address those circumstances. *See* KRS 61.823(4).

-38-

Lastly, Bradshaw argues KCDC failed to "conspicuously post the meeting agenda within the Fiscal Court before the meeting, in violation of KRS 61.823(4)(c)." As her argument tends to indicate, KRS 61.823(4)(c) provides:

> As soon as possible, written notice shall also be posted in a conspicuous place in the building where the special meeting will take place and in a *conspicuous place* in the building which houses the headquarters of the agency. The notice shall be calculated so that it shall be posted at least twenty-four (24) hours before the special meeting.

(Emphasis added.)

Turning to the facts relevant to this argument, nothing of record indicates where in the fiscal court building KCDC placed its KRS 61.823 notice. KCDC's only responses to this point were: (1) "[T]he agenda for all future special meetings at Fiscal Court will be posted in a conspicuous place, specifically, inside the door at the Fiscal Court Building at least twenty-four (24) hours before the special meeting (subject to any emergency)";[23] and (2) "Should this case continue, discovery will confirm that the posting of meeting agendas was part of Bradshaw's job responsibilities."[24] However, KCDC filed into the record (as "Exhibit 6" to its CR 12.02 motion) a copy of an October 3, 2024 email from KCDC chairperson, Kimberly Gester, to KCDC's board members and employees, including Bradshaw.

---

[23] *See* KCDC's December 22, 2023 answer to Bradshaw's OMA complaint (Record at 28).

[24] *See* KCDC's CR 12.02 motion (Record at 67).

The email included, as an attachment, the October 6, 2023 Special KCDC meeting agenda. And the email stated: "All, Attached is the agenda for the special called KCDC meeting on Friday, October 6, 2023 at 1 PM. We will be meeting in the conference room at Fiscal Court." The circuit court cited this email in its July 31, 2024 order as evidence that Bradshaw had actual notice of the special meeting three days before it occurred.[25] Bradshaw, for her part, has never controverted that email or claimed otherwise; nor does she argue or explain how KCDC's alleged failure in this regard amounts to willful or prejudicial misconduct, as opposed to a mere technical violation of the OMA.

In summary, we find no error in the circuit court's decision to dismiss Bradshaw's OMA claims, or her breach of contract claim predicated upon those alleged violations. Before concluding this section of our analysis, however, an additional point must be addressed. Bradshaw argues she was entitled to more time for discovery regarding these claims. In support, she repeats her arguments addressed above and adds:

> [T]he court did not treat [KCDC's CR 12.02] motion as a motion to dismiss. Instead, the court treated it as a motion for summary judgment without any advanced notice to Appellant that it would do so prior to Appellant filing her pleadings in response to the Motion to Dismiss. As a result, Appellant's briefings were not postured for summary judgment review by the trial court.

---

[25] Record at 137.

Bradshaw Br. at 6.

Bradshaw's argument has no merit. We have already addressed her arguments relating to these claims and need not readdress them. The circuit court did not need to give Bradshaw "advanced notice" that it could treat KCDC's CR 12.02 motion as a motion for summary judgment – CR 12.02, by its own plain terms, should have already alerted Bradshaw to that possibility. Furthermore, Bradshaw does not explain how she would have otherwise "postured" her briefings. It is not the responsibility of this Court to construct legal arguments on behalf of an appellant and scour the record to find where it might provide support for their claims, and we will not do so. *Harris v. Commonwealth*, 384 S.W.3d 117, 131 (Ky. 2012).

### 3. Whistleblower claim

Bradshaw claimed KCDC terminated her employment in violation of the Kentucky Whistleblower Act (KWA), KRS 61.101 *et seq*. However, the KWA only applies when an "employee" is subject to some form of reprisal from an "employer"[26] – two words the KWA defines in KRS 61.101 as follows:

> (1) "Employee" means a person in the service of the Commonwealth of Kentucky, or any of its political subdivisions, who is under contract of hire, express or implied, oral or written, where the Commonwealth, or any of its political subdivisions, has the power or right to

---

[26] *See generally* KRS 61.102.

-41-

control and direct the material details of work
performance;

(2) "Employer" means the Commonwealth of Kentucky
or any of its political subdivisions. Employer also
includes any person authorized to act on behalf of the
Commonwealth, or any of its political subdivisions, with
respect to formulation of policy or the supervision, in a
managerial capacity, of subordinate employees[.]

The circuit court dismissed Bradshaw's KWA claim against KCDC
because it determined Bradshaw could not be deemed an "employee" and KCDC
could not be deemed an "employer" within the meaning of those provisions.
Bradshaw now claims the circuit court erred in this regard.

We disagree. Whether KCDC is subject to liability under the KWA is
dependent upon whether KCDC is – consistently with KRS 61.101(2) – "the
Commonwealth of Kentucky or any of its political subdivisions." The answer to
that question requires a determination of whether KCDC would be entitled to
sovereign immunity:[27] if it is, then KCDC is an "employer" under the KWA; if it
is not, then the KWA does not apply to KCDC. *See N. Ky. Area Dev. Dist. v.
Wilson*, 612 S.W.3d 916, 920-25 (Ky. 2020) (applying sovereign immunity
analysis to discern entity's status as a covered employer under the KWA). Making

---

[27] Parenthetically, if the General Assembly wishes to subject an entity that is not otherwise
entitled to sovereign immunity to liability under the KWA, it knows how to do so. *See, e.g.*, *N.
Ky. Area Dev. Dist. v. Wilson*, 612 S.W.3d 916, 919 (Ky. 2020) (discussing KRS 147A.116(f)).
It has not done so in this context, so we are constrained to the KWA's existing parameters.

that determination depends upon principles distilled from our caselaw. The

following is an apt summary of those principles:

> Nothing in [the Kentucky Constitution] directly incorporates the state's sovereign immunity. *See Yanero v. Davis*, 65 S.W.3d 510, 524 (Ky. 2001); *Ky. Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 329 (Ky. 1990). But two provisions "indirectly" recognize the doctrine's existence. *Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009) (quoting *Wilder*, 84 S.W.2d at 39).[28] The first bars Kentucky from spending money without its legislature's approval: "No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law[.]" Ky. Const. § 230. The second allows the legislature to permit suits against Kentucky: "The General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth." *Id*. § 231.
>
> These two provisions have a narrow reach. They give Kentucky's legislature the power to waive sovereign immunity; they do not give it the power to create that immunity. *See Yanero*, 65 S.W.3d at 523-24; *Reyes v. Hardin County*, 55 S.W.3d 337, 338-39 (Ky. 2001); *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 344 (Ky. 1997). In other words, although § 231 of Kentucky's constitution allows its legislature to decide when parties may sue the "Commonwealth," Kentucky's courts get to decide whether a suit against a particular actor triggers sovereign immunity because it qualifies as a suit against the "Commonwealth" within the meaning of § 231. *Withers*, 939 S.W.2d at 342-43. So the Kentucky legislature lacks free rein to grant sovereign immunity to entities that would not have received it under its common-law origins. *See Berns*, 801 S.W.2d at 329-30.

---

[28] The full citation is *Kentucky State Park Commission v. Wilder*, 260 Ky. 190, 84 S.W.2d 38 (1935).

Indeed, other constitutional provisions – for example, one that bars the legislature from limiting the amount that a plaintiff may recover for injuries, Ky. Const. § 54 – restrict the legislature's power to enlarge immunity in this way. *See Yanero*, 65 S.W.3d at 525; *see also Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 797-802 (Ky. 2009).

Applying this mix of common-law and constitutional rules, a court considering whether a specific state actor should receive sovereign immunity under Kentucky law must proceed in two stages by asking two questions. First: Would sovereign immunity have covered this actor at common law? *See Yanero*, 65 S.W.3d at 523–24; *Berns*, 801 S.W.2d at 329. Second: If an actor is otherwise eligible, has the legislature passed a statute waiving this immunity? *Compare Univ. of Louisville v. Rothstein*, 532 S.W.3d 644, 647-48 (Ky. 2017), with *Furtula v. Univ. of Ky.*, 438 S.W.3d 303, 305–06 (Ky. 2014). If not, the entity should receive immunity. *See, e.g.*, *Jefferson Cnty. Pub. Schs. v. Tudor ex rel. J.T.*, 664 S.W.3d 600, 604 (Ky. 2023).

. . . A court must first ask whether a state actor is even eligible for the sovereign immunity that the legislature may waive. The answer turns on the background "common law" rules of immunity, presumably as they existed when Kentucky enacted its current constitution in 1891. *Yanero*, 65 S.W.3d at 523; *cf.* William Baude, *Sovereign Immunity and the Constitutional Text*, 103 Va. L. Rev. 1, 8 (2017). Over the years, the Kentucky Supreme Court has recognized that its cases applying these principles have not been a model of clarity or consistency. *See Bryant v. Louisville Metro Hous. Auth.*, 568 S.W.3d 839, 845 (Ky. 2019); *Yanero*, 65 S.W.3d at 521. Today, the court has settled on a test that divides sovereign immunity into two parts: "pure" immunity and "governmental" immunity. *Comair*, 295 S.W.3d at 94; *Bryant*, 568 S.W.3d at 845.

The "pure" version of sovereign immunity applies to a narrow set of state entities that qualify for immunity without the need to prove anything else. *Bryant*, 568 S.W.3d at 845. This version unsurprisingly covers Kentucky itself. *See id.* It also covers Kentucky's counties. *Downing*, 8 S.W. at 265;[29] *see Yanero*, 65 S.W.3d at 526 (citing cases). And it covers employees of these two governments when sued "in their official capacities" – meaning that the funds from a money judgment will come from public coffers. *Schwindel v. Meade County*, 113 S.W.3d 159, 169 (Ky. 2003). This rule of pure immunity does not apply, by contrast, to most entities that these governments create, including state agencies. *See Bryant*, 568 S.W.3d at 845. It also does not apply to cities, which the Kentucky Supreme Court treats as "municipal corporations" rather than arms of the government. *Comair*, 295 S.W.3d at 95. And it does not apply to state or county employees sued in their "individual capacities." *Yanero*, 65 S.W.3d at 522. These employees must instead rely on the distinct doctrine of "qualified" immunity. *Id.*

The "governmental" version of sovereign immunity covers a broader set of entities. It can reach even "non-governmental or quasi-governmental bodies" (or their employees sued in their official capacities). *Howard v. Big Sandy Area Dev. Dist., Inc.*, 626 S.W.3d 466, 470 (Ky. 2020); *see Comair*, 295 S.W.3d at 103. Yet these entities must meet two additional requirements. *See Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015). An entity seeking governmental immunity must have been created by (and be under the control of) a government that itself qualifies for immunity – that is, the entity must have an immune "parent[.]" *See Howard*, 626 S.W.3d at 470. Dating back to the time of Kentucky's current constitution, Kentucky courts have also held that the entity must

---

[29] *Downing v. Mason Cnty.*, 87 Ky. 208, 8 S.W. 264, 265 (1888).

> undertake "an 'integral' function of state government."
> *Id*.; *compare Williams v. Louisville Ind. Sch. of Reform*,
> 95 Ky. 251, 24 S.W. 1065, 1066 (1894), with *Gross v.*
> *Ky. Bd. of Managers of World's Columbian Exposition*,
> 105 Ky. 840, 49 S.W. 458, 459 (1899).

*New Albany Main St. Props. v. Watco Cos., LLC*, 75 F.4th 615, 624-25 (6th Cir. 2023).

With that in mind, KCDC is obviously not entitled to "pure" sovereign immunity because it is not the state or a county government. It is also not entitled to governmental immunity, either. Relative to the first part of the governmental immunity test outlined above, KCDC is "a non-profit corporation established under KRS Chapter 154.50 as a joint city/county effort for industrial development in Frankfort and Franklin County." *Delphi Auto. Systems, LLC v. Cap. Cmty. Econ./Indus. Dev. Corp., Inc.*, 434 S.W.3d 481, 483 (Ky. 2014). In other words, it was formed and its membership was appointed *equally* by a non-immune entity (the City of Frankfort) and an immune entity (Franklin County), so it cannot be considered the "alter ego" or to be under the *control* of an immune entity. *See* KRS 154.50-326(1)(c); *see also Franklin Ord*. § 31.03(B); *Frankfort Ord*. § 36.197(A) (providing KCDC's board consists of six members, three of whom are appointed by the Mayor of Frankfort; three by the Franklin County Judge/Executive; and that the Mayor and Judge/Executive sit as *ex officio*, non-voting members).

Regarding the second part of the test, it also does not perform an integral function of state government. To elaborate, entities that serve integral functions of state government focus upon "state level governmental concerns that are common to all of the citizens of this state, even though those concerns may be addressed by smaller geographic entities (*e.g.*, by counties). Such concerns include, but are not limited to, police, public education, corrections, tax collection, and public highways." *Comair*, 295 S.W.3d at 99. By contrast, an entity that does *not* serve integral functions of the state tends "to exercise proprietary functions addressing purely local concerns" and is "created mainly for the interest, advantage, and convenience of the locality and its people[.]" *Id*. at 99-100.

The purpose of the *Local* Industrial Development Authority Act, KRS 154.50-301 *et seq.*, (emphasis added), is:

> [T]o create local industrial development authorities to aid in the acquisition, retention and development of land for industrial and commercial purposes in Kentucky; to aid in the development and promotion of industrial sites, parks and subdivisions for accommodating industrial and commercial needs; to promote and stimulate the acquisition, retention and development of land for industrial and commercial purposes in Kentucky by other local development organizations both public and private.

*See* KRS 154.50-313.

The individual focus of each local industrial development authority created under the auspices of this legislative scheme (such as KCDC) is limited to

the *region* of the governmental units it serves. For example, local industrial development authorities "aid" and "promote" the "acquisition" of land for industrial and commercial purposes by making non-binding recommendations to the governmental units they serve for those units to initiate condemnation proceedings within those specific localities. *See* KRS 154.50-320(2).

Each local industrial development authority created under this legislative scheme also provides *nonessential* assistance. To that point, KRS 154.50-301 *et seq.* "is permissive and not mandatory, and consequently, [governmental units are] allowed to act independent of its provisions." *See Dannheiser v. City of Henderson*, 4 S.W.3d 542, 547 (Ky. 1999). As the plain language of KRS 154.50-320 also indicates, the role of each local industrial development authority is to *aid*, *promote*, and *assist* specific governmental units with economic development, and to assist *other* entities that perform the *same* function.[30] This defeats the notion that the existence of KCDC or any other local

---

[30] In full, KRS 154.50-320 provides:

   (1) The purpose, duties, and powers of the authority shall be to:

      (a) Acquire, retain, and develop land for industrial and commercial purposes in Kentucky; aid in the development and promotion of industrial sites, parks, and subdivisions to meet industrial and commercial needs in Kentucky.

      (b) Encourage the acquisition, retention, and development of land for industrial and commercial needs in Kentucky by other local development organizations, both public and private.

industrial development authority is "integral" or essential to any function of the governmental units they serve. *See Wilson*, 612 S.W.3d at 925.

The individual local industrial development authorities also perform *purely local* functions. To that point, the chief role of these entities is to aid and

---

(c) Cooperate with the United States Army Corps of Engineers and other federal agencies in formulating development plans and in acquiring and developing land for industrial and commercial purposes in accordance with these plans.

(d) Acquire by contract, lease, purchase, gift, condemnation, or otherwise any real or personal property, or rights therein, necessary or suitable for establishing industrial sites, parks, or subdivisions. The authority may dispose of any real or personal property, or rights therein, which in the opinion of the authority are no longer needed to carry out the purposes of KRS 154.50-301 to 154.50-346. The authority may lease, sell, or convey any or all industrial sites, parks, and subdivisions owned or optioned by it to any public or private organization, governmental unit, or industry for the purpose of constructing and/or operating any manufacturing, industrial, or commercial facility. Provided, however, that no sale or conveyance of any land shall be made to a private organization or industry without such organization or industry first having executed a written contract with the authority providing that if no actual construction of a manufacturing, industrial, or commercial facility, as set forth in the executed contract, is commenced within ten (10) years, the organization or industry shall offer to reconvey the land, free and clear of liens and encumbrances, to the authority, and should the authority accept the offer of reconveyance, it shall return to the organization or industry ninety-five percent (95%) of the purchase price paid therefor.

(2) Upon the adoption by the authority of a resolution reciting that property is needed for industrial sites, parks, and subdivisions and cannot be acquired by negotiation and purchase at its fair market value, the governmental units in which such land is located may direct and institute condemnation proceedings in the name of such governmental units, for the use and benefit of the authority. The procedure for condemnation shall conform to the procedure set out in the Eminent Domain Act of Kentucky. Upon acquisition of the property, the governmental unit shall convey the property to the authority upon payment by the authority to the governmental unit of an amount of money equal to the judgment and costs paid by the governmental unit.

promote the "development of land." KRS 154.50-313. The "development of land," in turn, is defined in this context as:

> [T]he improvement and provision of facilities essential to the use of land for manufacturing, industrial, and commercial purposes such as, but not limited to, core drilling, grading, *sewerage systems*, *water systems*, access roads, rail lines, electrical lines, layout planning, and the construction and equipping of buildings.

KRS 154.50-310(3) (emphasis added).

The Kentucky Supreme Court has explained that *sewerage* and *water systems*, while "no doubt critically important" within the localities they serve, "simply do[] not perform an integral state function. Sewage disposal and storm water management systems are not a traditional and necessary state function such as those functions performed by the state police, our public schools, the corrections system, and public highways and airways." *Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 864 (Ky. 2015). If those constituent features of "land development" are not considered integral state functions, it would be absurd not to treat the remaining features of "land development" (*i.e.*, core drilling, grading, access roads, rail lines, electrical lines, layout planning, and the construction and equipping of buildings) the same way. All of those functions promote local development that primarily benefits a specific locality's businesses and residents, which is "quintessentially the type of local concern that simply is not common to

-50-

all citizens of the state." *N. Ky. Area Planning Comm'n v. Cloyd*, 332 S.W.3d 91, 95-96 (Ky. App. 2010).

Notwithstanding, Bradshaw argues KCDC *does* perform integral state functions because, in her view, the General Assembly said that it does. In that vein, she cites the "declaration of public purpose" relative to KRS 154.50-301 *et seq.*, particularly those parts of it emphasized below:

> The acquisition of any lands for the purpose of developing industrial sites, parks and subdivisions is hereby declared to be a public and *governmental function*, exercised for a public purpose, and *a matter of public necessity*, and such lands and other property, easements and privileges acquired in the manner and for the purposes enumerated in KRS 154.50-301 to 154.50-346 shall and are hereby declared to be acquired and used for public and *governmental purposes* and as a matter of *public necessity*.

KRS 154.50-346 (emphasis added). Bradshaw's argument is largely founded upon the following quote from *Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 849 (Ky. 2019):

> "The enunciation of public policy is the domain of the General Assembly." *Pyles v. Russell*, 36 S.W.3d 365, 368 (Ky. 2000). Often, this Court must turn to the legislative statement of public policy in making judicial determinations. *See generally Giuliani v. Guiler*, 951 S.W.2d 318 (Ky. 1997). "[A]bsent a constitutional bar or command to the contrary, the General Assembly's pronouncements of public policy are controlling on the courts, as this Court has ruled countless times." *Murphy v. Commonwealth*, 500 S.W.3d 827, 832 (Ky. 2016) (quoting *Carter v. Bullitt Host*, LLC, 471 S.W.3d 288,

-51-

296 (Ky. 2015)). Although the question of whether an entity is immune is a judicial question, the question of whether a function is "integral" to the state can turn on the question of public policy. The Commonwealth, through its General Assembly, determines what priorities, responsibilities, duties, and functions the state chooses to undertake. Thus, the General Assembly, to a certain extent, must have the legislative prerogative to enunciate *what* is integral to the state's function. Granted, such a statement cannot be a broad, vague declaration without proof in the actual record; otherwise, the immunity doctrine would become a legislative whim rather than a judicial determination. However, we acknowledge, especially given the Commonwealth's strong stance on the doctrine of separation of powers, that the legislative statement of public policy *informs* the judiciary's decision of whether a function is essential, or integral, to the administration of the Commonwealth.

(Footnotes omitted.)

With that said, Bradshaw's argument is unpersuasive. Nothing in *Bryant* contravenes the settled rule, stated previously, that the General Assembly does not grant entities immunity, and that the common-law rule of immunity is exclusively for the judiciary to define. Moreover, we are unwilling to assume the General Assembly's "declaration of public purpose" set forth above is at all germane. That *same* statutory provision and its attendant declaration of public purpose existed in 2001, when the Kentucky Supreme Court rendered *Kea-Ham Contracting, Inc. v. Floyd County Development Authority*, 37 S.W.3d 703 (Ky. 2000), *as modified on denial of reh'g* (Mar. 22, 2001). That opinion resolved whether another local industrial development authority created under the auspices

-52-

of KRS 154.50-301 *et seq.* was entitled to governmental immunity. There, the Kentucky Supreme Court noted – as we have noted here – that the "key factor" in the governmental immunity analysis is "whether, when viewed as a whole, the entity is carrying out a function integral to state government." *Id*. at 706 (footnote omitted). And in its final analysis, the Kentucky Supreme Court determined the local industrial development authority created under the auspices of KRS 154.50-301 *et seq.* was *not* entitled to governmental immunity.

Taken at face value, it appears Bradshaw is asserting that when the Kentucky Supreme Court denied governmental immunity to the local industrial development authority in *Kea-Ham*, the Kentucky Supreme Court was ignorant of the "declaration of public purpose" set forth in KRS 154.50-346. But that is not an assertion we can entertain. Our Supreme Court is presumptively aware of the law at all times. *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 930 (Ky. 2002). We must accordingly presume it denied the local industrial development authority governmental immunity *despite* that declaration of public purpose. And here, we have no reason to do otherwise. KCDC is not entitled to governmental immunity. It therefore cannot be considered an "employer" under the KWA. As such, the circuit court properly dismissed Bradshaw's KWA claim.

## CONCLUSION

Considering the foregoing, we AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEE:

Philip C. Lawson               Erica K. Mack
Frankfort, Kentucky            John K. Wood
                               Lexington, Kentucky